HENRY C. MUELLER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2398–69.    Filed April 5, 1973.

*Robert O. Rogers*, for the petitioner.
*Richard G. Holloway*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioner's Federal income tax as follows:

| Year | Amount | Claimed overpayment |
|------|--------|---------------------|
| 1962 | $1, 524. 82 | 0 |
| 1963 | 14, 937. 59 | 0 |
| 1966 | 34, 264. 14 | 0 |
| 1967 | 329. 99 | [1] $970. 73 |

[1] Arising out of a claimed carryover loss from 1966.

The years 1964, 1965, and 1968 are also involved for the purpose of determining whether there are, and the amount of, any net operating loss carryovers or carrybacks and capital loss carryovers to the years here in issue.

The parties have now agreed as to some issues, and those remaining for our decision are:

(1) Whether petitioner sustained a capital loss deduction in 1962 because of the sale of his interest in McHenry's Tomatoes, Inc.;

(2) Whether notes petitioner received from Nathan McHenry became worthless in 1965;

(3) Whether petitioner is entitled to a deduction upon the transfer of his assets to a trustee in bankruptcy in 1966;

(4) Whether petitioner is entitled to the benefit of any unused net operating loss of the trustee in bankruptcy in 1968; and

(5) Whether petitioner must recapture an allowed 1962 investment credit on assets transferred to a trustee in bankruptcy in 1966 prior to the expiration of their useful life.

### GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner, Henry C. Mueller, was a resident of Delray Beach, Fla., at the time of the filing of the petition herein. He filed his Federal

income tax returns with the district director of internal revenue, Newark, N.J., for the taxable years 1962 and 1963, and with the district director of internal revenue, Jacksonville, Fla., for the other years in issue. All of these were separate returns except the 1965 return which was filed jointly with his then wife, who is not a party to this proceeding.

### Issues 1 and 2. Claimed Capital Losses and Bad Debt

#### FINDINGS OF FACT

During the year 1959 petitioner, a cash basis taxpayer, entered into an oral partnership agreement with Nathan McHenry (McHenry), a friend since childhood. The partnership, Nathan McHenry Farms (Farms), was formed to raise peppers in Florida. The Florida growing season begins each year about July 1 with planting and preparing land, and ends about the first of the following June.

Under the terms of the partnership agreement, petitioner advanced moneys to Farms with the understanding that he would receive a return of his capital and 50 percent of the profits. McHenry was to receive 50 percent of the profits for his labor and was to be responsible for 50 percent of the losses.

Farms commenced operations on July 1, 1959, and ended operations on June 30, 1960. During this period petitioner advanced sums in the total amount of $30,350 to Farms, which were treated as loans on its books and records. Petitioner contributed $350 of this amount in December 1959, and the remaining $30,000 in June of 1960. In addition, petitioner paid two notes of Farms in the amount of $29,000, and bills of the partnership in the sum of $1,595.

Farms used the moneys petitioner contributed together with the proceeds of the above notes to pay its operational costs and to purchase equipment. The equipment purchased by Farms had a cost basis of $30,207.37.

During its sole year of operation, Farms sustained an operating loss in the amount of $38,380.13. Petitioner has never claimed his share of this partnership loss as a deduction in any income tax return.

Despite Farms' losses, petitioner believed that McHenry was a good farmer and decided to continue in business with him for the purpose of recouping their losses. Accordingly, in 1960 they entered into a new farming venture with two other individuals, Ritter and Runyon, for the purpose of raising tomatoes. This venture was incorporated as McHenry's Tomatoes, Inc. (Tomatoes).

Petitioner contributed $25,000 to Tomatoes on behalf of himself and McHenry to purchase one-half of its stock, while Runyon and

Ritter each contributed $12,500 for the remaining stock. Petitioner and McHenry agreed that their share of the profits of Tomatoes was to be used first to repay petitioner's total contributions to Farms and Tomatoes, with any excess amounts to be split evenly between them.

Upon incorporation, Tomatoes received the physical assets of Farms and assumed all of Farms' liabilities except certain notes payable to petitioner. The physical assets had a book value of $25,993.87 at this time and the liabilities assumed totaled $11,400.77. Petitioner received a chattel mortgage in some undisclosed face amount on these physical assets upon their transfer to Tomatoes and was paid "quite a bit" of the face amount of this mortgage.

Tomatoes was engaged in the farming business during the 1960–61 and 1961–62 farming seasons and was unsuccessful. During this period it borrowed moneys from its shareholders, including $16,000 from petitioner on behalf of himself and McHenry. In addition, petitioner was required to satisfy $25,000 of corporate notes which he had guaranteed.

Following the 1962 season, petitioner and McHenry met to settle their business accounts and $4,000 or $5,000 in personal loans which petitioner had extended to McHenry. They reached a compromise of $69,000, whereupon McHenry executed 10 sealed notes of $6,900 each, with 5-percent interest. One note was due on each June 1 starting in 1963 and continuing through 1972.

As part of the overall settlement, petitioner transferred his interest (including all his stock and notes) in Tomatoes to McHenry and released his mortgage on the corporation's assets so that McHenry could borrow operating capital. Both placed a value of $12,500 on the interest which petitioner transferred to McHenry.

The amount Tomatoes owed petitioner on the mortgage at this time was not presented in evidence. The records of neither Farms nor Tomatoes were presented at trial.

McHenry's acquisition of petitioner's interest in Tomatoes enabled him to go into partnership with Kermit Dell (Dell), who had purchased the combined interest of Runyon and Ritter in Tomatoes. The partnership was profitable during the 1962-63 season, and the first note due petitioner was satisfied by payment.

By the end of the 1963–64 growing season, Dell and McHenry had parted company. Dell bought out McHenry's interest in their partnership by giving him $6,000 and canceling McHenry's obligation to repay $18,000 to the partnership. McHenry went to petitioner and told him he would not be able to pay the June 1, 1964, note on time, but that he hoped to have the money eventually. Petitioner gave him an extension on the note.

For the 1964-65 season, McHenry went into the produce brokerage business, a business which, if successful, could have generated enough money to pay the balance of the 1964 note in full. McHenry was unsuccessful in this venture and, following the 1964–65 season, he left Florida and moved to New Jersey.

In October 1965, McHenry obtained employment with Lawn Craft, Inc., at a salary of $150 per week. His weekly salary was thereafter increased to $250 after a few months and presently he is paid $350.

On November 24, 1965, the Internal Revenue Service filed a Notice of Federal Tax Lien against McHenry in Palm Beach County, Fla., showing an outstanding tax liability for 1964 in the amount of $5,230.86. McHenry paid this tax liability in full by 1970, and in addition paid a 1966 tax liability in the approximate amount of $800.

After 1965, petitioner made no efforts to enforce collection from McHenry.

OPINION

### Issue 1. Capital Loss

Petitioner contributed moneys and made loans to a partnership, Farms, and later a corporation, Tomatoes, on behalf of himself and McHenry. The two were to share equally in profits and losses. Both ventures were unsuccessful. McHenry agreed to pay $69,000 to petitioner in a combined settlement for his share of the business losses, petitioner's interest in Tomatoes, and approximately $5,000 in personal loans.

As a result of these transactions, petitioner claims a capital loss in the amount of $42,754.93. This claimed loss is not supported by the evidence and we therefore hold that petitioner is not entitled to any capital loss.

Petitioner and McHenry testified that $12,500 of the combined settlement represented the purchase price of petitioner's interest in Tomatoes. In order for petitioner to sustain a capital loss, his basis in Tomatoes must exceed this amount.

Petitioner invested a total of $63,472.50 in Farms and Tomatoes on his own behalf.[1] To determine petitioner's basis in Tomatoes, this investment must first be decreased by $24,890.45 to reflect the total of petitioner's distributive share in Farms' 1959–60 net operating loss plus his share of Farms' liabilities which were assumed by Tomatoes. (Secs. 705(a)(2)(A) and 358).[2] These reductions would decrease petitioner's basis in Tomatoes to $38,582.05.

---

[1] Both parties have conceded on brief that the incorporation of Tomatoes was a nontaxable transaction under sec. 351.

[2] All statutory references are to the 1954 Internal Revenue Code unless otherwise specified.

A further decrease in basis is required because petitioner received payments on the mortgage he held on the assets which were transferred from Farms to Tomatoes. We do not know the amount petitioner was paid, or even the face amount of the mortgage. The record only discloses that petitioner was paid "quite a bit" on the mortgage. If petitioner had received payments of slightly over $26,000 on the mortgage, he would not have sustained any loss on the sale of his interest in Tomatoes.[3]

Given the paucity of facts in the record, it is impossible to determine if petitioner in fact sustained a capital loss on the disposition of his interest in Tomatoes. Petitioner has clearly failed to carry his burden of proving that he is entitled to this claimed loss deduction.

### Issue 2. Bad Debt Loss

The second issue for our decision is whether notes given by McHenry to petitioner were worthless at the end of 1965.

In 1962, McHenry and petitioner had reached a compromise whereby McHenry agreed to pay petitioner $69,000 in satisfaction of all prior obligations, and for petitioner's interest in Tomatoes. McHenry executed 10 notes of $6,900 each, the first note payable June 1, 1963, and the others payable annually thereafter each June 1 through 1972. One of these notes was satisfied in 1963. Petitioner alleges that the balance of the notes in the aggregate amount of $62,100 became worthless in 1965.

Section 166 allows a deduction for "any bad debt which becomes worthless within the taxable year." Thus, we must determine from all the surrounding facts and circumstances whether the notes from McHenry actually became worthless in 1965, the burden of proof being on the petitioner. *Earl V. Perry*, 22 T.C. 968 (1954); *Herbert W. Dustin*, 53 T.C. 491 (1969). We conclude that petitioner has failed to sustain his burden of proof on this issue and therefore he must be denied the deduction.

It is true that in June of 1965, McHenry left Florida with few assets. However, at this time only two of the notes were due. Further, by October of 1965, McHenry was employed at $150 per week and has remained employed since that time. McHenry testified that he is currently earning $350 per week and has paid in full all obligations incurred since he left Florida, including approximately $7,000 in Federal tax liens.

---

[3] It is at least plausible that petitioner did receive as much as $26,000 in mortgage principal payments, since Farms possessed physical assets with a cost basis of $30,207.37.

We also note that petitioner has made no attempt whatever to collect this debt. Furthermore, petitioner reported the notes as assets at $62,100 when he filed his petition in liquidating bankruptcy on September 27, 1966, thereby indicating that he did not consider them worthless in 1965.

Given these considerations, petitioner clearly is not entitled to a bad debt deduction in 1965.

*Issues 3 and 4. Business Expense Deduction on Loss of Assets in Bankruptcy and 1968 Net Operating Loss*

FINDINGS OF FACT

From 1964 until September 27, 1966, petitioner was engaged in the business of farming in Delray Beach, and St. Augustine, Fla. For this period he maintained his books and records and filed his joint or separate income tax returns utilizing the cash method of accounting and a calendar year accounting period.

From January 1, 1966, until September 27, 1966, petitioner's income exceeded his paid business expenses by more than $60,000. On September 27, 1966, petitioner filed a voluntary petition in bankruptcy with the U.S. District Court for the Southern District of Florida, wherein he listed total liabilities of $299,693.12 and total assets of $185,802.80.

A trustee was appointed for petitioner's bankrupt estate, and acquired title to all property belonging to petitioner on September 27, 1966, by operation of law.

Among the assets acquired by the trustee was real property used in petitioner's trade or business having a cost basis to him of $60,000, and subject to a lien in the amount of $43,960. In addition, the trustee acquired two parcels of real property held by petitioner for investment purposes with a combined cost basis of $7,375, and a second residence of petitioner having a cost basis in excess of $23,000. The trustee also acquired farm equipment with a total adjusted cost basis to petitioner of $92,135.24 and subject to liens in the amount of $51,688.53.

The trustee's liquidation activities in respect of petitioner's property began in October 1966 and continued well into 1967. The total unsecured claims allowed in the bankruptcy amounted to $119,679.39. Of this amount $106,591.01 was attributable to ordinary and necessary business expenses which would have been deductible in the year of payment if paid by petitioner without the intervention of bankruptcy.

The court proceedings in respect of petitioner's bankrupt estate terminated in 1968. At that time, the trustee paid $43,702.31 of the trade or business expenses which petitioner had incurred prior to entering bankruptcy, and also paid $27,953.66 in attorney fees, adminis-

tration and court costs. In 1966 the trustee had received $2,300 from the sale of crops.

The trustee did not file any fiduciary income tax returns (Form 1041) for the periods covering his administration. Had he filed correct returns for such periods, there would have been no taxable income. The parties stipulate that, had there been a tax loss, no part of such loss would have been absorbed in any prior taxable period of the bankrupt estate.

On his income tax return for the taxable year ended December 31, 1966, Mueller claimed a net loss from farming operations in the amount of $38,375.92. The principal cause of the loss was a claimed business expense deduction for a "loss" on assets transferred to the trustee in bankruptcy. As a result of this claimed loss, petitioner filed a loss carryback claim to 1963 which was tentatively allowed. This loss carryback was not completely absorbed in 1963. Accordingly, since petitioner had already claimed net losses in his Federal income tax returns for 1964 and 1965, he carried forward the unused portion of the 1966 loss into 1967.

Respondent has determined that petitioner is not entitled to the loss claimed for 1966, and consequently that petitioner had taxable income in 1966 in the amount of $69,412.97.

OPINION

The third issue for our decision is whether petitioner is entitled to an ordinary business deduction for 1966 under section 162 upon the transfer of his assets to a trustee in bankruptcy to satisfy debts incurred in his trade or business.

From January 1, 1966, until September 27, 1966, petitioner, a cash basis taxpayer, received business income which exceeded his paid business expenses by more than $60,000.

On September 27, 1966, petitioner filed a voluntary petition in bankruptcy and title to his assets was transferred to a trustee in bankruptcy. At the time of bankruptcy petitioner had unpaid business expenses in excess of $100,000. In 1968 the bankruptcy proceedings terminated. At that time the trustee paid trade or business expenses which had been incurred by the petitioner prior to bankruptcy in the amount of $43,702.31.

Petitioner contends that the transfer of title to his assets to the trustee in bankruptcy constitutes either "payment" or "constructive payment" of his unpaid business expenses, and that he is therefore entitled to a deduction under section 162, the amount deducted being measured by his adjusted basis in the assets transferred to the trustee.[4]

---

[4] Compare *Homer A. Martin, Jr.*, 56 T.C. 1294, 1298 *et seq.*, dealing with claimed inventory reduction measured by the basis of inventory merchandise turned over to the trustee in bankruptcy.

In *B & L Farms Co.* v. *United States*, 238 F. Supp. 407 (S.D. Fla. 1964), affirmed per curiam 368 F. 2d 571 (C.A. 5, 1966), certiorari denied 389 U.S. 835 (1967), the Fifth Circuit decided the precise issue before us and held that a bankrupt taxpayer was not entitled to a business expense deduction upon the transfer of his assets to the trustee in bankruptcy. An appeal from the decision in the instant case lies to the Fifth Circuit[5] and we are therefore required by *Jack E. Golsen*, 54 T.C. 742 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971), to follow the Fifth Circuit's decision. We therefore hold that petitioner was not entitled to a section 162 deduction upon the transfer of his assets in bankruptcy. Consequently, we sustain respondent's determination for 1966 and do not allow petitioner's claimed overpayment in 1967.

Petitioner argues that *B & L Farms* is distinguishable because that decision involved a corporate taxpayer, whereas he is an individual taxpayer. We dismiss petitioner's contention because the decision in *B & L Farms* was based on the requirement of actual payment by a cash basis taxpayer before a deduction will be permitted under section 162, and is applicable to both individual and corporate taxpayers.

As to issue 4, petitioner contends that the trustee in bankruptcy had an unused net operating loss at the date of termination of the bankrupt estate, and that he is entitled to the benefit of this loss as a deduction in 1968 and a carryback to 1966. Petitioner argues that he is entitled to this loss because he is a "beneficiary succeeding to the property of the trust or estate" under section 642(h).[6]

Section 642(h) has no application to an individual bankrupt taxpayer, and we hold that petitioner is not entitled to any unused net operating loss at the termination of the bankrupt estate.

Section 642(h) provides generally that upon termination of an estate or trust, any unused net operating loss carryover under section 172 shall be allowed as a deduction to the beneficiaries succeeding to the property of the estate or trust.[7] Petitioner argues that he should

---

[5] Sec. 7482(b)(1).

[6] We note that neither the Internal Revenue Code nor the Federal Bankruptcy Act deals specifically with the tax aspects of a voluntary petition in bankruptcy. *Norris Bloomfield*, 52 T.C. 745, 748. Obviously, allocation of percentage receipts between business and non-business creditors would pose many problems.

See Krause & Kapiloff, "Bankrupt Estate, Taxable Income and the Trustee in Bankruptcy," 34 Ford. L. Rev. 401 (1966).

[7] SEC. 642(h). UNUSED LOSS CARRYOVERS AND EXCESS DEDUCTIONS ON TERMINATION AVAILABLE TO BENEFICIARIES.—If on the termination of an estate or trust, the estate or trust has—

(1) a net operating loss carryover under section 172 or a capital loss carryover under section 1212, or

(2) for the last taxable year of the estate or trust deductions (other than the deductions allowed under subsections (b) or (c)) in excess of gross income for such year,

then such carryover or such excess shall be allowed as a deduction, in accordance with regulations prescribed by the Secretary or his delegate, to the beneficiaries succeeding to the property of the estate or trust.

qualify as such a beneficiary because estates of bankrupt individuals are taxed under the same provisions as estates of decedents.

While it is true that income of a bankrupt estate is taxed as income of an estate, Rev. Rul. 68–48, 1968–1 C.B. 301; G.C.M. 24617, 1945 C.B. 237, it is not clear that a bankrupt estate is an estate for all purposes of taxation. Rev. Rul. 68–48, and its progenitor, G.C.M. 24617, deal solely with the duty of the trustee in bankruptcy to report income and the manner of reporting. Section 642 and the regulations thereunder deal only with estates and trusts, both inter vivos and testamentary, and nowhere describe or designate a bankrupt individual's estate as an estate within the meaning of the statute.

Furthermore, it is unlikely that petitioner is "the beneficiary succeeding to the property of the estate or trust" within the meaning of 642(h). The bankrupt individual taxpayer is not included in the definition of "beneficiaries succeeding to the property of the estate or trust" in section 1.642(h)–3, Income Tax Regs.[8]

Moreover, it is apparent that the bankrupt taxpayer was not intended to be covered by the statute. It is evident that the purpose of section 642(h) was to afford some measure of relief to beneficiaries of estates who take diminished interest in the property of an estate as a result of losses by the estate. *Greggar P. Sletteland*, 43 T.C. 602, 610 (1965). A bankrupt taxpayer does not have a diminished interest in his bankrupt estate because of expenses or losses incurred by the estate, but rather his creditors receive a lesser amount. In fact, through the bankruptcy proceedings, the bankrupt taxpayer is discharged from liabilities which here were (and usually are) greatly in excess of the basis in the property which he turned over, and is also relieved from any income from cancellation of indebtedness as well. *Astoria Marine Construction Co.*, 12 T.C. 798, 801 (1949).

---

[8] Sec. 1.642(h)–3 Meaning of "beneficiaries succeeding to the property of the estate or trust".

(a) The phrase "beneficiaries succeeding to the property of the estate or trust" means those beneficiaries upon termination of the estate or trust who bear the burden of any loss for which a carryover is allowed, or of any excess of deductions over gross income for which a deduction is allowed, under section 642(h).

(b) With reference to an intestate estate, the phrase means the heirs and next of kin to whom the estate is distributed, or if the estate is insolvent, to whom it would have been distributed if it had not been insolvent. If a decedent's spouse is entitled to a specified dollar amount of property before any distribution to other heirs and next of kin, and if the estate is less than that amount, the spouse is the beneficiary succeeding to the property of the estate or trust to the extent of the deficiency in amount.

(c) In the case of a testate estate, the phrase normally means the residuary beneficiaries (including a residuary trust), and not specific legatees or devisees, pecuniary legatees, or other nonresiduary beneficiaries. However, the phrase does not include the recipient of a specific sum of money even though it is payable out of the residue, except to the extent that it is not payable in full. On the other hand, the phrase includes a beneficiary (including a trust) who is not strictly a residuary beneficiary but whose devise or bequest is determined by the value of the decedent's estate as reduced by the loss or deductions in question. * * *

Given the above, and recognizing that the allowance of "deductions depends upon legislative grace; and only as there is clear provision therefor, can any particular deduction be allowed," *New Colonial Co.* v. *Helvering*, 292 U.S. 435, 440 (1934), it is clear that petitioner is not entitled to any unused deductions of the bankrupt estate under section 642(h).

### *Issue 5. Recapture of Investment Credit*

#### FINDINGS OF FACT

In a schedule attached to his 1965 return, petitioner claimed an investment credit under section 46(a) for 1965 in the amount of $4,028.95. He also claimed an unused investment credit from 1964 in the amount of $1,825.42, for a total of $5,854.37.

On July 28, 1967, respondent allowed petitioner a carryback of his unused investment credit from the years 1964 and 1965 to the year 1962 in the amount of $5,854.37.

The property with respect to which petitioner claimed his qualified investment credits for 1964 and 1965 was property used in his trade or business of farming in those years. The useful life of such property ranged from 4 to 8 years. This same property passed from the petitioner to the trustee in bankruptcy on September 27, 1966.

#### OPINION

Petitioner received a carryback investment credit for 1962 based on section 38 property acquired in 1964 and 1965. Respondent contends that petitioner must recapture part of this credit under section 47(a)(1) because the property was transferred to the trustee in bankruptcy in 1966, prior to the end of its useful life. We agree with respondent.

Section 47(a)(1) provides as follows:

SEC. 47. CERTAIN DISPOSITIONS, ETC., OF SECTION 38 PROPERTY.

\*          \*          \*          \*          \*          \*          \*

(1) EARLY DISPOSITION, ETC.—If during any taxable year *any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer,* before the close of the useful life which was taken into account in computing the credit under section 38, then the tax under this chapter for such taxable year shall be increased by an amount equal to the aggregate decrease in the credits allowed under section 38 for all prior taxable years which would have resulted solely from substituting, in determining qualified investment, for such useful life the period beginning with the time such property was placed in service by the taxpayer and ending with the time such property ceased to be section 38 property. [Emphasis supplied.]

The broad language of the statute is easily capable of application to transfers from a bankrupt taxpayer to a trustee in bankruptcy. It

should be noted that the trustee and bankrupt taxpayer are two separate taxable entities. *Norris Bloomfield*, 52 T.C. 745, 750 (1969).

Furthermore, the Senate Finance Committee report in respect of this statute manifests an intention to include within its scope such transfers in bankruptcy. The report includes the following language: "In general, property will be considered disposed of whenever it is sold, exchanged, transferred, distributed, involuntarily converted, or disposed of by gift. [S. Rept. No. 1881, 87th Cong., 2d Sess., 1962–3 C.B. 852–853.]"

Therefore, in view of our finding that the useful life of the assets in question extended beyond 1966, we hold that petitioner is required to recapture investment credit in 1966.

Petitioner argues that recapture is not required because under section 47(b) disposition of section 38 property is exempt from recapture where there is a mere change of the form of conducting the business.[9] This section is obviously inapplicable to petitioner on the facts of this case because it also requires that "the taxpayer retain a substantial interest in such trade or business."

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

SIMPSON, *J.*, concurring: In my judgment, the results in connection with issues 3 and 4 are unfortunate; however, the Court was required to reach the conclusions adopted by the majority, and it will require the creative hand of the legislature to enact new laws that will bring about reasonable results in this situation.

In connection with issue 3, the conclusions are required not only because of the technicality that there has been no payment, but also because it is impossible in 1966 to know whether, or to what extent, the business expenses of the petitioner will ultimately be paid. The assets transferred by him to the trustee in bankruptcy may be used to pay personal obligations, and in any event the business expenses may be paid only in part. To allow a deduction in 1966 for all of the expenses would obviously be unjustifiable.

Similarly, in connection with issue 4, it is clear that the debtor is

---

[9] The pertinent language of sec. 47(b) is as follows:

(b) SECTION NOT TO APPLY IN CERTAIN CASES.—Subsection (a) [requiring recapture] shall not apply to—

*     *     *     *     *     *     *

For purposes of subsection (a), property shall not be treated as ceasing to be section 38 property with respect to the taxpayer by reason of a mere change in the form of conducting the trade or business so long as the property is retained in such trade or business as section 38 property and the taxpayer retains a substantial interest in such trade or business.

not a beneficiary of the estate, and when section 642(h) was enacted, there was no consideration of its applicability to a bankrupt estate.

Yet, these conclusions cause a distortion of income. In 1966, the petitioner earned income and incurred expenses in connection with the earning of that income. Eventually, some of those expenses may be paid, but they are never taken into consideration in computing the income of the petitioner which is subject to taxation. The bankrupt estate, when the expenses are paid, is entitled to deductions, but those deductions cannot be offset against the appropriate income and might be of no use to the estate. A legislative solution might be to allow a special carryback of the loss sustained by the bankrupt estate. It is clear that the present tax laws do not bring about appropriate results in connection with a bankruptcy, and that this matter must be dealt with by legislation.

IRWIN and HALL, *JJ*., agree with this concurring opinion.

———

QUEALY, *J.*, dissenting: With respect to the holding under the caption "Issues 3 and 4. Business Expense Deduction on Loss of Assets in Bankruptcy and 1968 Net Operating Loss," the result of the opinion of the majority is to tax the petitioner on his gross receipts, since no distinction is made between liabilities incurred on account of expenditures which would otherwise be credited to the cost of sales and liabilities accrued on account of expenditures deductible by the grace of the legislature.[1]

If the taxpayer had kept his books and records and filed his returns on the accrual basis of accounting, the liabilities in question would have constituted deductions either from gross receipts as a part of the cost of sales or from gross income as ordinary and necessary expenses *regardless whether ever paid*. On the other hand, even if the trustee in bankruptcy of petitioner's estate had paid all liabilities out of the assets of the petitioner, under the decision of the majority, no deduction would ever be allowed to the petitioner notwithstanding the payment of his liabilities out of the assets of his estate in the hands of the trustee.

I do not believe that this disparity in result as between a cash basis taxpayer and an accrual basis taxpayer under the internal revenue laws can be allowed to stand. Where an interpretation of the law, whether literal or otherwise, produces an absurd result, I would seek a different answer. For example, see *Bongiovanni* v. *Commissioner*, 470 F. 2d 921 (C.A. 2, 1972), reversing a Memorandum Opinion of this Court.

---

[1] While I realize that what would be the cost of goods sold for a manufacturer has been termed as an expense for the farmer, such terminology does not change the result.

With respect to the holding under the caption "Issue 5. Recapture of Investment Credit," I must also disagree. The term "involuntary conversion" is a word of art under the internal revenue laws. The statement in the report of the Committee on Finance [2] that "property will be considered disposed of whenever it is * * * involuntarily converted," I would take to mean a conversion which results from a condemnation, fire or other casualty, and the like. An involuntary conversion does not occur upon the filing by the taxpayer of a petition in bankruptcy. In fact, the decision in *B & L Farms Co.* v. *United States*, 238 F. Supp. 407 (S.D. Fla. 1964), affirmed per curiam 368 F. 2d 571 (C.A. 5, 1966), certiorari denied 389 U.S. 835 (1967), relied upon by the majority as a basis for its opinion under issues 3 and 4, is predicated, in part, on the assumption that the trustee in bankruptcy represents both the bankrupt and the creditors. If this is the correct view, there is even less reason to treat the taking of title in a fiduciary capacity by the trustee in bankruptcy as a disposition of the property which triggers recapture of the investment credit.

DAWSON, FEATHERSTON, STERRETT, and GOFFE, *JJ.*, agree with this dissent.

[2] S. Rept. No. 1881, 87th Cong., 2d Sess., 1962-3 C.B. 852-853.