JOSE F. OLIVARES AND NANCY OLIVARES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Olivares v. Commissioner
Docket No. 5979-81.
United States Tax Court
T.C. Memo 1983-649; 1983 Tax Ct. Memo LEXIS 139; 47 T.C.M. (CCH) 165; T.C.M. (RIA) 83649; October 24, 1983. Jose F. Olivares and Nancy Olivares, pro se. Marion Friedman, for the respondent. *141 DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: Respondent determined the following deficiency and additions to tax in petitioners' 1976 Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6651(a) [1]
Sec. 6653(a)
Sec. 6654(a)
1976
$19,498.79
$4,876.69
$974.94
$725.41
After concessions by the parties, the remaining issues for decision are: 1. Whether petitioners are entitled to a deduction for a theft or other casualty loss in the amount of $40,000. 2. Whether petitioners are entitled to deductions of $2,909.19 and $1,942.25 for repairs and janitorial expenses, respectively, allegedly incurred in connection with their hotel operations. 3. Whether petitioners are entitled to a $3,629.75 deduction for travel, entertainment, and promotion expenses allegedly incurred in connection with petitioners' legal, hotel, and engineering businesses. 4. Whether petitioners are entitled to a $1,000 business bad debt deduction. 5. Whether petitioners are *142 liable for the section 6651(a) and section 6653(a) additions to tax.
To facilitate the disposition of the factual issues presented, we will combine our findings of fact and the discussion of the applicable legal principles. Petitioners Jose and Nancy Olivares, husband and wife, were residents of San Antonio, Texas, when they filed their petition herein. Their Federal income tax return for 1976 was filed with the Internal Revenue Service Center in Austin, Texas. Some of the facts have been stipulated. The stipulation and attached exhibits are incorporated herein by reference. Petitioner Jose Olivares is qualified to practice as an attorney and as an engineer in the State of Texas. During 1976 he and members of his family operated a hotel in what is now the St. Paul Square urban renewal project of the City of San Antonio, Texas. St. Paul Square was designated for urban renewal because the buildings in the area had become depressed, yet many of them had retained some historical or architectural value. Issue 1: Theft or Casualty Loss
Petitioners claimed a $40,000 loss attributable to personal property which was stored in various buildings in which they held an interest *143 (hereinafter those buildings shall be referred to as petitioners' real properties). The real properties that petitioners owned or had an interest in were the Continental Hotel and some commercial properties. These were located within the St. Paul Square area. The renewal plan adopted for St. Paul Square provided for the acquisition or purchase of real property at fair market value. This would occur in cases where the owners of the property refused to rehabilitate their buildings in accordance with the planned design, or where the owners merely wished to relocate and have their properties acquired. The Continental Hotel and the commercial property were within the boundaries of the St. Paul Square renewal scheme, but were not originally listed as "properties to be acquired" in that plan. However, the plan did provide that other properties, such as those owned by petitioners, would be acquired if a property owner made known his intentions not to comply with rehabilitation standards. On January 22, 1976 the San Antonio City Council adopted the renewal plan and thereafter began implementation of the project. The entity charged with carrying out the plan was the Urban Renewal *144 Agency of the City of San Antonio (hereinafter URA). On May 12, 1976 two lawsuits were filed in the name of the City of San Antonio in the County Court of Bexar County, Texas.These suits, causes C-1353 and C-1354, sought to acquire title to the hotel and commercial property which petitioners owned, or in which they held an interest. On September 14, 1976 the County Court in the above cases found that the plaintiff therein had complied with the necessary legal prerequisites entitling it to take possession of the properties, ordered that the sums awarded as condemnation damages be deposited with the Clerk of that Court, and that writs of possession should be issued. That same day, counsel for the URA (hereinafter HBH), 1a notified petitioners that the sums were available for them to claim, that the URA now had the right to possession of the real properties, and that URA's relocation department would contact them to assist in the move. Petitioners resisted. Contrary to what was in the plan above, petitioner *145 Nancy Olivares claimed that she had been orally informed by the heads of the URA that petitioners' properties would not be acquired. By the end of 1976, petitioners had made numerous demands to responsible URA officials that they were being wrongfully deprived of their real properties and the personal property stored therein. Causes C-1353 and C-1354 were titled with the City of San Antonio listed as the plaintiff. However, the actions were actually brought on behalf of the URA, which had mistakenly filed the suits in the City's name. On March 21, 1977, causes C-1353 and C-1354 were dismissed because the suits had been brought, technically, in the name of the wrong party. That same day, URA refiled in the appropriate court to acquire title to petitioners' real properties. This was cause C-1398. Petitioners were aware of the mistake in filing and suffered no mistaken impression as to which party was actually seeking to acquire their real properties. HBH wrote petitioners on May 3, 1977 notifying them that because of the March 21, 1977 dismissal order, URA would not attempt to exercise any right of possession to the real properties until another writ of possession was granted. *146 Such writ was issued on June 16, 1977 along with the Court's finding that the taking in cause C-1398 was lawful and that sums awarded as condemnation damages would be deposited with the Clerk of the Court. [2]
Thereafter, URA's relocation manager, Robert Moore, wrote petitioner Jose Olivares on July 21, 1977 to inform petitioners that their buildings were being acquired and that the relocation personnel were ready to assist in planning for vacating the property. Petitioners did not reply. On August 23, 1977 HBH wrote petitioners a certified letter requesting them to contact Mr. Moore to arrange for removal of their personal property from the buildings. Even though petitioners wanted their personal property returned, they only wanted it if they could obtain it in conjunction with the return of the real properties. Between November 7 and December 21, 1977 petitioners and a third party filed a cross-claim in cause C-1398. Petitioners therein alleged that the URA seized and confiscated *147 personal property located within petitioners' real properties and claimed damages resulting from such seizure in an amount of not less than $40,000. After transferring the case from the County Court to the District Court of Bexar County, a final judgment was entered on January 17, 1979 upholding the condemnation of petitioners' real properties and declaring that $78,250 (plus interest) was to be recovered by petitioners from the URA. [3]
Nancy Olivares appealed the District Court judgment, and on September 12, 1979 the Texas Court of Civil Appeals dismissed her appeal. Thereafter, petitioners filed an action in the United States District Court for the Western District of Texas. [4] A Memorandum Opinion and Order dated February 28, 1983 was *148 entered in that case whereby the Court dismissed plaintiffs' complaint on the basis of res judicata and allowed attorneys' fees to defendants because plaintiffs' action was "frivolous, unreasonable, and groundless." On January 2, 1979 Robert Moore sent petitioner Jose Olivares a certified letter which requested petitioners to remove their personal property from the buildings and once again announced his agency's readiness to assist with petitioners' relocation. On February 20, 1979 HBH wrote petitioners to inform them that they *149 had 15 days to tell the URA where their personal property stored in the buildings should be sent. Otherwise, the letter stated, it would be moved to a commercial storage area. Moore sent another letter dated February 28, 1979 informing petitioners that the personal property must be removed by March 15, 1979. Because of petitioners' refusal to remove their personal property or to designate where it should be shipped, the goods were transferred to a storage company. The storage company then wrote petitioners several times that it had received goods from the URA in which it believed petitioners had an interest and that the goods would soon be auctioned to pay for the increasing storage fees. [5]
In all of their dealings with the URA and HBH, petitioners refused to address their claim for return of their personal property separately from that of the condemnation of the real properties. This attempt to press their demand for a joint recovery resulted in petitioners' responding to the invitations from the URA, HBH, or the storage company merely with rambling *150 letters containing allegations of illegal behavior on behalf of those parties. Subsequent to September 14, 1976 petitioners never entered the real properties and had no knowledge that any of their personal property was removed, damaged, or in any way tampered with in 1976. At all times prior to January 1, 1977, there was a reasonable prospect of recovery of the personal property. Section 165[6] allows a deduction for any loss sustained during the taxable year if certain other conditions are met. Petitioners claimed a $40,000 "section 165 loss" on their 1976 return attributable to the alleged loss of personal property. [7] They premise their argument on the claim that on September 14, 1976 the County Court's granting possession of their real properties to the URA in causes C-1353 and C-1354 resulted in a "conversion" of their personal property. *151 Respondent disallowed the alleged loss in its entirety in his notice of deficiency. He claims that it does not qualify for a deduction under section 165 for a number of reasons: [8] (1) if a casualty loss occurred, petitioners admit that there existed in 1976 a claim for recovery or reimbursement with respect to which there was a reasonable prospect of recovery; (2) petitioners have failed to substantiate their loss becuase they have not proved the identity of personal property allegedly taken, its acquisition cost, or a reasonable estimate of its fair market value; (3) condemnation of the buildings did not give rise to a theft or casualty loss with regard to the personal property contained therein; (4) if a theft loss occurred, petitioners did not "discover" it during the 1976; and (5) there was no specific act during 1976 which could actually have precipitated a permanent loss. We agree with respondent for the reasons set out below. In short, there is no loss here for the year claimed. *152 Petitioners confuse the condemnation of the real properties with their claim for the loss of their personal property contained therein. Even accepting, arguendo, their claim that the buildings were seized illegally, at no time were petitioners denied the right to possession of their personal property. The latter could have been removed by them at any time during 1976 and thereafter. Thus, there is no completed transaction or event in 1976 which warrants our treating a loss as having been sustained during that year. Accordingly, no deduction is allowed under section 165(a). Section 1.165-1(d)(1), Income Tax Regs. If there was anything remotely akin to a loss in 1976, it was caused by petitioners' refusal to take their own property. Any loss which might have occurred as a result of their nonaction is insufficient to come within the provisions of the statute. Cf. Jernigan v. Commission,T.C. Memo. 1981-44; Carlisle v. Commissioner,T.C. Memo. 1976-314. Moreover, even if a casualty or other event resulting in a loss occurred it would not help petitioners. Losses from such events are not deductible during any *153 taxable year where there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery. Sections 1.165-1(d)(2)(i), 1.165-1(d)(3) and 1.165-8(a)(2), Income Tax Regs. URA and all related parties manifested a willingness at all times to place the personal property in petitioners' possession. Therefore, there was at all times a reasonable prospect of recovery up until the presumed disposition by the storage company in 1980. [9] Cf. Jernigan v. Commissioner,T.C. Memo. 1981-44. Petitioners' sole argument is that since they have proven there was a "taking" by the URA they are entitled to the claimed loss deduction. We disagree. More is required. Petitioners have not met the requirements set out in the regulations. Accordingly, no theft or other casualty losses relating to the personal property are deductible in 1976. Issue 2: Repairs and Janitorial Expenses
Petitioners claimed *154 deductions in connection with their operation of the Continental Hotel in the amounts of $2,909.19 for repairs and $1,942.25 for janitorial expenses. Petitioners offered no documentation supporting these deductions. They claim that their records were lost during an eviction from their residence, also through a condemnation proceeding. [10] They rely solely on the testimony of Mr. Olivares and that of his father, who managed the hotel. The claim for repairs is predicated on day-to-day physical maintenance of the Continental Hotel including plumbing, window breakage, lock repair and key grinding, and screens. Petitioners claim that when their return was prepared, they arrived at the $2,909 figure through compilation of various receipts and records. We have doubts about the accuracy of this explanation. However, having considered the testimony and the surrounding facts and circumstances (including the possible application of section 263), we conclude that petitioners are entitled to a $726 deduction for repairs performed in conducting their hotel business. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). *155 The janitorial expense is attributable to monies paid to Damaso Bernal, a retired handyman who was hired to come in weekends when the regular janitor was off. Petitioners again rely only on their general testimony. We conclude they are entitled to a $415 deduction for janitorial expenses in 1976. Cohan v. Commissioner,supra.
Issue 3: Travel and Promotional Expenses
Petitioners claimed a deduction of $3,629.75 for travel, entertainment, and promotional expenses on several of the Schedule C's attached to their 1976 return. Of the above amounts, $1,736.85 was in connection with Jose Olivares' legal services, while $692.91 was attributable to his engineering business.Both of these amounts were labeled "conferences, meetings/travel." In connection with the hotel operations, $1,200 was deducted for "promotion." The deductions for "conferences, meeting/travel" pertain to several trips that Jose Olivares took during 1976 to meet with clients. He could not recall what costs are included in those figures (i.e., sums paid for meals, etc). The "promotion" figure is an estimate of amounts claimed to have been paid to taxi cab drivers who would recommend *156 the hotel to vistors, cash for tickets, meals, coffee, and out-of-pocket personal expenses for groups using the hotel. [11]
Section 274 provides, in part, that no deduction shall be allowed for any traveling expense or for any item with respect to an activity which is generally considered to constitute entertainment or recreation or for any expense for gifts, unless the taxpayer substantiates such expenses by adequate records or by other sufficient evidence. While petitioners' testimony regarding the promotional expenses was general and vague, it is clear that entertainment and gifts comprised a substantial, if not the total, portion of such amount. [12] We therefore conclude that the "promotion", as well as the "conferences, meetings/travel" expenses are subject to the substantiation requirements of section 274(d). See section 1.274-2(b)(1)(i), Income Tax Regs.
*157 Petitioners admit they have no records, but claim that they did have such records at one time. They contend that their records were lost when the building in which they were staying (not the Continental Hotel) was also condemned and they were rapidly evicted. They further contend that the records would have been sufficient to substantiate their figures and therefore ask us to apply the Cohan rule to allow the deductions.We decline to do so. The regulations under section 274 specifically preclude an application of the Cohan rule in contravention of section 274's requirements. Section 1.274-5(a), Income Tax Regs. We also have previously determined that the Cohan rule is inapplicable to expenses subject to the substantiation requirements of section 274(d). Sanford v. Commissioner,50 T.C. 823, 827-28 (1968), affd. per curiam, 412 F.2d 201 (2d Cir. 1969). With respect to petitioners' explanation that their failure to substantiate their expenses is due to the loss of their records during their eviction, section 1.274-5(c)(5), Income Tax Regs., provides for the following exception: *158 (5) LOSS OF RECORDS DUE TO CIRCUMSTANCES BEYOND CONTROL OF TAXPAYER. Where the taxpayer establishes that the failure to produce adequate records is due to the loss of such records through circumstances beyond the taxpayer's control, such as destruction by fire, flood, earthquake, or other casualty, the taxpayer shall have a right to substantiate a deduction by reasonable reconstruction of his expenditures. [Emphasis supplied]. Petitioners do not qualify for this exception. It is clear the moving, even subject to an eviction, is not a "casualty beyond the taxpayer's control." Cf., Gizzi v. Commissioner,65 T.C. 342 (1975). See Barry v. Commissioner,T.C. Memo. 1978-250. Accordingly, petitioners are not excused from the substantiation requirements of section 274(d), and hence they are not entitled to deductions for these expenses. Issue 4: Bad Debt
Petitioners claimed a business had debt deduction in the amount of $1,000 in connection with legal services performed and monies advanced to Aguinaddo Zamora in prior years. Zamora is both a client and an old friend of Jose Olivares. Mr. Olivares claims to have loaned money to help *159 resolve financial difficulties which Zamora encountered from time to time. At the end of 1976, petitioners claim, Zamora still owed Mr. Olivares for the monies loaned and the services performed. The arrangement between Zamora and Mr. Olivares was an informal transaction. No note was executed, no due date or interest rate was established, and no security was offered or taken. Mr. Olivares did not send a demand letter or make a demand for payment. He did not sue Zamora, but merely concluded that the amount owed would not be paid.
Section 166 allows a deduction for debts which become worthless during the taxable year, provided other conditions are met. We think the petitioners have failed to meet the threshold requirement of section 166 that the debt became worthless within the taxable year. Worthlessness is a question of fact and the taxpayer bears the burden of proof on that issue. Mueller v. Commissioner,60 T.C. 36 (1973), affd. in part and revd. in part 496 F.2d 899 (5th Cir. 1974). See Welch v. Helvering,290 U.S. 111, 115 (1933). *160 The record reveals no indication of worthlessness. [13] No evidence was presented showing Zamora was incapable of paying, such as insolvency, lack of assets, or bankruptcy. In fact, petitioners' testimony revealed that Zamora possessed a significant asset in 1976 (a warehouse). That Zamora had financial setbacks does not in itself prove worthlessness. In addition, the failure to undertake any collection efforts reflects unfavorably on petitioners' allegation of worthlessness. See Davies v. Commissioner,54 T.C. 170 (1970).Since the petitioners have not carried their burden of providing worthlessness in 1976, we hold that no bad debt deduction is allowed. Issue 5: Additions to Tax
Respondent determined additions to tax under sections 6651(a) for failure to file a timely return, and under section 6653(a) for negligence. *161 Respondent's determination is presumptively correct and the burden is upon petitioners to prove that these additions are erroneous. Enoch v. Commissioner,57 T.C. 781, 802 (1972); Courtney v. Commissioner,28 T.C. 658 (1957). Section 6651(a) provides that an addition to tax shall be imposed where a taxpayer is delinquent in filing a required return, unless it is shown that the failure to timely file is due to reasonable cause and not due to willfull neglect. Petitioners asked for and received two extensions for the filing of their 1976 Federal income tax return. Based upon the two granted extensions, their return was due August 15, 1977. They requested a third extension prior to that date but it was denied. They mailed their return in late December, 1977. Respondent received it on January 4, 1978. Petitioners claim reasonable cause for their failure to timely file the return. However, we think their reasons are inadequate, and we hold for respondent. First, petitioners claim they should be excused because they requested a third extension. *162 It is clear, however, in situations such as this, that making a request for an extension, the granting of which is discretionary with respondent, does not constitute reasonable cause where the request is subsequently denied. See Heller v. Commissioner,T.C. Memo. 1980-417, affd. in an unpublished opinion 679 F.2d 873 (2d Cir. 1981). Second, petitioners claim that it was necessary to determine the outcome of the controversy with the URA to see if they should claim a loss for 1976. [14] We do not accept this as reasonable cause. All taxpayers are required to timely file their returns. Petitioners recognized this responsibility by requesting and receiving two extensions. The granting of a third extension was discretionary with respondent. [15] To allow a taxpayer to delay filing his return until he is satisfied that his reporting position is correct concerning all items would erode any semblance of meaning to the term "due date." The correct procedure for petitioners would have been to report the transaction in conformance with all the known facts and circumstances and in accordance with respondent's rules and regulations. If subsequently determined *163 facts indicate that a different treatment was warranted, the petitioners could then have filed an amended return. Finally, petitioners assert that the circumstances surrounding the evictions and condemnations created an environment of general chaos whereby unreasonable stress, pressure or overwork caused the delay. Here again petitioners were aware of their legal obligation to file a return and had the benefit of a six month extension. We think it strains credulity that in all that time there were no opportunities to do so. We conclude that this reason is insufficient to constitute reasonable cause. See Dustin v. Commissioner,53 T.C. 491, 507 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Therefore, we sustain respondent's determination as to the section 6651(a) addition to tax. Respondent *164 also determined that petitioners are liable for the section 6653(a) addition to tax because petitioners have failed to maintained records adequate to substantiate claimed deductions as required by section 6001.
Section 6001 imposes upon all taxpayers the obligation to maintain at all times accurate books and records to enable substantiation of income and expenses. Petitioners admit that they kept no records as to some claimed deductions. They presented no evidence to show whether their records, if available, would be considered adequate. They also have not demonstrated any significant attempt to duplicate or reconstruct such records. Accordingly, we conclude that they have failed to carry their burden of proof on this issue and are liable for the addition to tax under section 6653(a). See Robbins v. Commissioner,T.C. Memo. 1981-449; Heller v. Commissioner,supra.
To give effect to the concessions of the parties and our conclusions with respect to the disputed issues, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all references to sections shall be to the Internal Revenue Code of 1954, as amended and in effect during 1976.↩
1a. HBH was a private law firm retained by the URA. Empowered to act as URA's agent, it occasionally contacted persons affected by condemnation's on its own initiative.↩
2. On June 13, 1977, a Board of Special Commissioners held a hearing and thereafter awarded sums in the amount of $20,000 for the commercial property and $57,500 for the hotel property.↩
3. On February 16, 1979 the final judgment was reformed (as to unrelated matters) and a final judgment nunc pro tunc was entered. Previously, on December 14, 1978, petitioners' cross claim had been dismissed and a jury was empaneled to determine the fair market value of the real properties. The jury awarded $20,750 for one and $57,500 for the other. See footnote 2, supra.↩ The judge adopted these figures in his final judgment.
4. Petitioners' apparent claim throughout the protracted litigation is that members of URA and HBH, in conjunction with several judges, conspired to appropriate their property either for self-enrichment or as the result of racial bias. An additional party, George Warner, held an interest in the real properties. Petitioners, either as successors in title or as co-tenants, acted for Warner in these disputes. Several other law-suits arising from the condemnation proceedings were instituted in various courts by Jose Olivares as counsel for Warner. We have omitted the chronology of those cases as superfluous to the issue at hand. Warner died in 1978.↩
5. The URA had agreed to pay the first 30 days of storage costs. All costs thereafter were charged to petitioners.↩
6. SEC. 165. LOSSES (a) GENERAL RULE.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) AMOUNT OF DEDUCTION.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) LIMITATION ON LOSSES OF INDIVIDUALS.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return. * * * (e) THEFT LOSSES.--For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. ↩
7. At trial, petitioner Jose Olivares continuously refused respondent's characterization of petitioners' claim as resulting from a "theft or casualty loss." A significant portion of the personal property was for petitioners' own private use. However, petitioners make no attempt to show what portion of the property was used in a trade or business or in a transaction entered into for profit. See section 165(c)↩. In light of our decision herein, we need not make any such determination.
8. Although respondent's arguments generally center upon a "theft or casualty" classification, the facts established in support thereof are also sufficient to support our basis for decision.↩
9. Moreover, petitioners' Federal tax return states that "a lawsuit is pending" on the case. It is clear that this and the subsequent numerous cases filed prove that petitioners thought they had a significant chance of recovery in 1976.↩
10. These circumstances are more fully explained in Issue 3.↩
11. Respondent conceded a deduction of $868 for "commissions." Petitioners do not distinguish what portion of the "promotion" figure includes these "commissions."↩
12. As to any excess, we hold that petitioners have failed to carry their burden of proof that they did in fact make such payments. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.↩
13. We make no determination, though, that a qualifying debt occurred. To be deductible, the debt must arise as an enforceable obligation with a reasonable expectation and intent that repayment be made. Section 1.166-1(c), Income Tax Regs.; Zimmerman v. United States,318 F.2d 611↩ (9th Cir. 1963).
14. Petitioners are not alleging that they lacked records essential to the preparation of a return. ↩
15. We note that section 6081 provides that a reasonable extension of time for filing an income tax return may be granted, but that, other than in the case of taxpayers who are abroad, such extensions of time shall not be granted for more than six months.↩