ABE SEROT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Serot v. Commissioner
Docket Nos. 13904-90, 25391-92
United States Tax Court
T.C. Memo 1994-532; 1994 Tax Ct. Memo LEXIS 543; 68 T.C.M. (CCH) 1015; October 24, 1994, Filed *543 Decisions will be entered under Rule 155. For petitioner: Mark E. Cedrone. For respondent: Michael P. Corrado and Ruth Spadaro. DAWSON, DINAN
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to Special Trial Judge Daniel J. Dinan pursuant to section 7443A(b)(4) and Rules 180, 181, and 1983. [1] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax in docket No. 13904-90 as follows: Year
Deficiency
[1] Sec. 6653(b) 1979
$ 16,791
$ 8,395
1980
40,156
20,078
1981
81,299
40,649
1982
67,428
33,714
*544 Respondent determined deficiencies in petitioner's Federal income taxes in docket No. 25391-92 as follows: Year
Deficiency
1985
$ 7,086
1986
4,419
After petitioner's concessions, [2] the issues for decision are: (1) Whether petitioner's two wholly owned corporations, Lauren Beth, Inc., and Living Better, Inc., should be disregarded for Federal income tax purposes; (2) if such corporations should be disregarded, whether petitioner was in the trade or business of lending money; (3) whether petitioner incurred business bad debt losses in the years 1979 through 1982; (4) whether petitioner incurred a theft loss in 1982; and (5) whether petitioner's alleged losses in the years 1979 through 1982 are sufficient to offset his income for those years. [3]
*545 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. Petitioner resided in Bala Cynwyd, Pennsylvania, at the time the petitions were filed in these cases. Petitioner's lending activities and his investment activities were interrelated; however, for convenience, we will discuss the activities separately. 1. Lending Activities
Petitioner, as he admitted, was a "lender * * * of last resort." Petitioner would lend money to those unable to obtain a loan from a bank or other regular financial institution. Petitioner made what would be considered high-risk loans. He charged an interest rate and a service fee which he determined to be commensurate with such risk. Interest rates charged by petitioner varied from the then-current prime rate to over 1 percent a day, and service fees frequently equaled 10 percent of the total amount of the loan. Petitioner did not advertise his lending services to the general public. However, his particular lending services were known throughout the local financing community. Petitioner commonly received referrals from bank officers *546 and employees of title companies. Mr. Berk, petitioner's long-time friend and attorney, recommended clients to him. On many occasions, petitioner made loans to persons brought to him by a "bird-dogger", the slang name for an individual who was paid a commission for arranging difficult financing.
At the time of trial, petitioner was 70 years old. He had been lending money since the early 1950s. Shortly after World War II, petitioner became actively involved in the acquisition and sale of low-priced real estate in and around the Philadelphia, Pennsylvania, area. Petitioner's involvement with low-priced real estate, on occasion, put him in contact with individuals in need of short-term loans who were willing to pay above-market interest rates. Petitioner discovered that making such loans could be very lucrative, provided the amounts lent could be collected. Most lending by petitioner was actually conducted through his two wholly owned corporations, Lauren-Beth, Inc. (Lauren-Beth), [4] and Living Better, Inc. (Living Better). In 1966, petitioner incorporated Lauren-Beth in Pennsylvania, and in 1970, petitioner incorporated Living Better, also in Pennsylvania. From their inception, *547 neither Lauren-Beth nor Living Better ever filed a Federal income tax return. Between 1979 and 1982, Lauren-Beth and Living Better filed Pennsylvania corporate income tax returns claiming to be inactive and paid a $ 10 self-assessing Pennsylvania capital stock tax. [5] Lauren-Beth and Living Better have never issued stock, held board meetings, elected officers, or observed other corporate formalities. Neither corporation has ever had an address other than petitioner's home address; on corporate letterhead and checks, petitioner referred to his apartment number as a suite number. Neither corporation has ever had a telephone number other than petitioner's personal telephone number. Petitioner paid personal expenses from corporate accounts and corporate expenses from his personal accounts. During the years in issue, the corporations had separate *548 bank accounts. Petitioner generally would lend money from one of the corporate accounts. Living Better maintained a corporate bank account at Industrial Valley Bank (IVB) while Lauren-Beth maintained a corporate bank account at Fidelity Bank. There was no business reason why a loan was made from one corporate account as opposed to the other corporate account. At trial, petitioner introduced into evidence approximately 71 separate loan files spanning the years 1973 through 1986. The records show that from 1976 through 1984, approximately 53 different loans were made either by petitioner, Lauren-Beth, or Living Better. In all instances the loans were made to persons or entities unrelated to petitioner. In most instances the loans were secured by a mortgage on real estate or a judgment note. The loans ranged in value from a few thousand dollars to over $ 100,000. Approximately one-half of the loans are for amounts exceeding $ 10,000. The total amount of money lent approximated $ 1,200,000. Petitioner and the borrower rarely entered into a loan agreement. In most cases the terms of the loan can only be determined by reference to the security; i.e., a mortgage or judgment note. *549 Almost all of the loans are for periods of 6 months or less. [6]
Petitioner, Lauren-Beth, and/or Living Better, may have, and most likely did, make other loans in addition to those mentioned above. It is also quite possible that some of the information in petitioner's loan files is erroneous. The loan records submitted by petitioner were generally disorganized. They were not organized by amounts, years, or borrowers. From each loan file it is virtually impossible to determine: Who made the loan (Lauren-Beth, Living Better, or petitioner); the interest rate; the length of time of the loan; the repayment terms; the service fees; the security, if any; *550 and, more importantly, the ultimate disposition of the loan. This is not to imply that all of the loan files are missing all of the above-listed information, but that many of the loan files are lacking some of the information. Petitioner also failed to maintain, or, at least, to submit at trial, comprehensive books or records of his lending activities. As petitioner admitted, from the 71 loan files submitted at trial, the income he earned on the loans during 1979 through 1982 simply cannot be determined. Petitioner opined, however, that the loans were very profitable. Petitioner has not shown that he reported any income from his lending activities on his Federal income tax returns from 1979 through 1982. Petitioner made loans, other than those discussed above, between 1979 and 1983, for which there is significantly better documentation and from which petitioner claims large losses. Each of these loans, or series of loans, will be discussed separately. a. Tuchinsky Loans
Beginning in 1979 and continuing until late 1982, Lauren-Beth advanced $ 132,599 to a number of different corporations controlled by or related to Arthur Tuchinsky (corporate loans). [7] Apparently, *551 the loans were for corporations that Mr. Tuchinsky was attempting to organize. Mr. Tuchinsky claimed to have been the owner of or involved in over 18 different corporations as of October 1981. Each loan was made out either to the corporation receiving the loan or to a corporate officer of the corporation receiving the loan for use by the corporation. As security for the loan, petitioner would receive stock in the corporation receiving the loan, or stock in another corporation owned by Mr. Tuchinsky. No formal loan documents were drawn up for any of the loans. Petitioner recalled that the interest rate on the loans varied from a minimum of 2 percent a month and up. The vast majority of Mr. Tuchinsky's corporations failed. In August 1982, Market Management (MM), a corporation controlled by Mr. Tuchinsky, paid $ 24,200 to Lauren-Beth. In 1984, Mr. Tuchinsky informed *552 Internal Revenue Service Special Agent Walker, who was conducting a criminal investigation of petitioner, that his records indicated that between 1979 and late 1982 he repaid $ 102,679 to petitioner or his corporations. This amount did not include the 1982 MM payment. During the same years, Lauren-Beth also advanced approximately $ 170,366 to Mr. Tuchinsky personally. [8] As before, no formal loan documents were drawn up for any of the personal loans. For the personal loans, petitioner did not require security. Petitioner claimed Mr. Tuchinsky never repaid the loans made to him. [9]
In April 1989, Mr. Tuchinsky, in a letter to petitioner, listed *553 the outstanding loan balance due petitioner, and his estimate of the value of collateral held by petitioner. [10] Mr. Tuchinsky stated that the loan balance was $ 490,000, exclusive of service and interest charges. Mr. Tuchinsky estimated the market value of collateral held by petitioner to be $ 187,000. In particular, Mr. Tuchinsky stated that petitioner owned stock in Amglo Industries worth $ 37,000, part of Gulf Port Films worth $ 140,000 (there was no value for the stock), and other miscellaneous stock worth $ 10,000. In March 1989, petitioner sold his stock in Amglo Industries for $ 56,980. Petitioner still owns the stock in Gulf Port Films and the miscellaneous stock referred to in the letter. *554 On January 29, 1990, Mr. Tuchinsky signed an affidavit regarding the ultimate disposition of the corporate loans. The affidavit included a schedule of the corporate loans, the date the funds were borrowed, the amount borrowed, and the year the entity ceased doing business. [11] Mr. Tuchinsky stated in the affidavit that five of his corporations, which had received $ 64,229, failed in 1981, and two of his corporations, which had received $ 10,420, failed in 1982. On January 30, 1990, Mr. Tuchinsky signed a revised affidavit. The revised affidavit was identical to *555 the first affidavit in all respects except that it included additional information on other corporate loans. The revised affidavit corresponds directly with checks written from Living Better to entities controlled or owned by Mr. Tuchinsky, which were introduced into evidence. The revised affidavit stated that one of his corporations, which had received $ 10,000, failed in 1979, six of his corporations, which had received $ 100,479, failed in 1981, and two of his corporations, which had received $ 22,120, failed in 1982. [12]
*556 b. Controlled Sanitation Loan
On March 3, 1975, Lauren-Beth signed an agreement with Controlled Sanitation Corp. (Control) which provided that Lauren-Beth would advance to Control over time approximately $ 100,000. The agreement was secured by a judgment obtained by Control against the International Association of Machinists and Aerospace Workers, which had previously been assigned to the Southeast National Bank. [13] Pursuant to the agreement, Control instructed the law firm in charge of collecting the judgment, Morgan, Lewis, & Bockius (Morgan), to distribute any surplus of moneys available in the account at the bank resulting from collection of the judgment after Control's obligation to the bank had been satisfied, to Lauren-Beth. Ultimately petitioner advanced $ 32,000 to Control pursuant to the agreement. *557 Due to an error by a Morgan associate, no funds were ever distributed to Lauren-Beth. Petitioner did not attempt to collect from Control, reasoning that to do so would be futile. Petitioner provided no explanation as to why he considered that any attempt to collect from Control would be futile. Instead, petitioner filed suit against Morgan in the Common Court of Pleas of Montgomery County. On January 17, 1980, petitioner's case against Morgan was dismissed. Petitioner appealed the dismissal to the Pennsylvania Superior Court. On or about March 28, 1982, the Pennsylvania Superior Court affirmed the Common Court of Pleas' Order of Dismissal. Petitioner then submitted an application for reargument, which was denied. Finally, petitioner filed a petition for review to the Pennsylvania Supreme Court. In October 1982, the Pennsylvania Supreme Court denied the petition. c. Lipschutz Loans
In 1979 or thereabouts, William Richman, a "bird-dogger" often used by petitioner, introduced him to Leonard Lipschutz. When petitioner first met Mr. Lipschutz, he was the president and owner of Pulmonary Equipment Rental Corp. (PERC). PERC was in the business of leasing medical equipment, *558 primarily life-support systems, to medical facilities throughout the eastern seaboard. Mr. Lipschutz sold his interest in PERC about August 1981, but continued to act as PERC's president. It is unclear whether petitioner was aware of Mr. Lipschutz' sale of his interest in PERC. Mr. Lipschutz informed petitioner that he was interested in expanding PERC's leasing operation, but, in order to do so, the corporation needed financing. Petitioner agreed to lend money so that Mr. Lipschutz or PERC could purchase equipment to be leased. As security for the loans, petitioner was to receive an assignment of the leases or ownership of such equipment. [14]
On February 4, 1980, Mr. Lipschutz received $ 16,200 *559 from Living Better. The loan was purportedly secured by an assignment of a lease of three respirators to the Richmond Memorial Hospital. The loan was to be repaid in 36 monthly payments of $ 875, for a total payment of $ 31,500. Mr. Lipschutz made 15 payments on the loan, $ 13,125. In August 1980, petitioner purportedly received an assignment of a lease from St. Mary's Hospital signed by an employee by the name of C.C. Kurtz. It was later discovered that this individual did not exist. In September 1980, Mr. Lipschutz and Linda Lipschutz, his spouse, received $ 9,820 from Living Better. The loan was secured by a mortgage on the Lipschutzes' personal residence in the name of Living Better. Mr. Lipschutz defaulted on the mortgage. Petitioner never foreclosed on the property. Mr. Lipschutz no longer lives in the home. Between January 1, 1981, and July 20, 1981, Mr. Lipschutz received $ 35,000 from Living Better. On March 2, 1981, $ 41,990 was wired from Living Better to Oxymed, Inc., for the purchase of four "Bear I" ventilators for PERC. The invoice listed Living Better as the purchaser of the units. On July 27, 1981, the Living Better account was credited in the amount *560 of $ 35,000. The credit slip indicates that the credit was a payment on the Lipschutz loan. Between July 28, 1981, and October 27, 1981, Mr. Lipschutz received $ 71,300 through eight advances from Living Better. On October 30, 1981, Mr. Lipschutz signed a judgment note in which he agreed to pay $ 137,894 to Living Better on or before November 22, 1981. In return for the note, Mr. Lipschutz received $ 20,000 from Living Better. The note provided that if payment was not made by the due date, interest would accrue at the rate of 1 percent per day. Mr. Lipschutz did not make any payment by the due date. Approximately one month later, on November 24, 1981, Mr. Lipschutz executed a second judgment note in which he agreed to pay $ 179,494 to Living Better on or before December 10, 1981. Upon signing the note, Mr. Lipschutz received another $ 20,000 from Living Better. Again, Mr. Lipschutz did not pay by the due date. On May 3, 1982, and June 1, 1982, petitioner gave Mr. Lipschutz certified checks drawn on his account at Bank Hapoalim in the amounts of $ 20,000 and $ 50,000, respectively. On June 4, 1982, Mr. Lipschutz received another $ 7,500 from Lauren-Beth. During the first *561 week of July 1982, petitioner deposited checks for $ 63,750 and $ 20,000 from Mr. Lipschutz into the Lauren-Beth account. At first the checks were not honored, but on the second attempt they were honored. On July 6, 1982, Mr. Lipschutz signed a no-interest $ 144,000 demand note payable to Lauren-Beth. As part of this loan transaction, Mr. Lipschutz entered into an agreement with Lauren-Beth which provided that Mr. Lipschutz was to lease 12 respirators from Lauren-Beth for $ 12,000 a month for 12 months. On the same day, Mr. Lipschutz received another $ 87,000 from Lauren-Beth. Mr. Lipschutz made no payments on the demand note, nor did he make any payments pursuant to the lease. On August 17, 1982, Mr. Lipschutz received $ 25,000 from Lauren-Beth. One week later, Mr. Lipschutz received another $ 25,000 from Lauren-Beth. On September 30, 1982, Lauren-Beth signed an agreement in which Lauren-Beth purchased from Mr. Lipschutz all his interests in certain personal property listed in an attached schedule for the sum of $ 1. The schedule attached to the agreement listed 65 respirators by serial numbers. Of the 65 listed respirators, 25 were duplicate listings of the same serial *562 numbers, and 12 were respirators that Lauren-Beth was actually leasing to Mr. Lipschutz, according to the July 1982 lease agreement. In October 1982, Mr. Berk, for the first time, began filing security interests on all personal property owned by Mr. Lipschutz. For reasons unstated, in connection with the filing of the security interests, Mr. Berk became concerned about the actual existence of the equipment and the leases reportedly owned or assigned to petitioner by Mr. Lipschutz. On October 25, 1982, petitioner gave Mr. Lipschutz another $ 40,000 from his account at Bank Hapoalim. During the next month or so, Mr. Berk made inquiries of the various medical facilities that Mr. Lipschutz indicated were leasing equipment from him or PERC. Mr. Berk also made inquiries of the manufacturer of some of the respirators, Puritan-Bennett Corp. (Puritan), as to whether Puritan had actually manufactured respirators with serial numbers the same as those listed on the September 30, 1982, agreement. Mr. Berk also began a belated investigation into the financial situation of Mr. Lipschutz. By the end of 1982, Mr. Berk had discovered that all the respirators, which petitioner believed he had *563 owned, either did not exist, were owned by other entities, or were already fully collateralized by others. [15] With respect to the leases assigned to petitioner, Mr. Berk discovered that they were all fraudulent. [16] Mr. Berk also discovered that Mr. Lipschutz was an alcoholic, a compulsive gambler, a manic depressive, and, in his view, judgment proof. At the end of 1982, Mr. Lipschutz stated that he was destitute and estimated his gambling debts at approximately $ 1 million. Petitioner did not pursue criminal charges against Mr. Lipschutz. Rather, on February 6, 1983, Mr. Berk required Mr. Lipschutz to sign an agreement in which he stated that he owed Lauren-Beth $ 415,000. Under *564 the agreement, Mr. Lipschutz was to pay Lauren-Beth the sum of $ 2,500 per month, and, if Mr. Lipschutz were to regain control of PERC, he was to cause PERC to guarantee the loan. When the agreement was signed, Mr. Berk did not expect Mr. Lipschutz to ever pay petitioner. Mr. Berk advised that such an agreement would be a good precaution in the unlikely situation where Mr. Lipschutz might come into any significant amount of money. When Mr. Lipschutz defaulted on the note, petitioner did not attempt to collect. In a letter dated February 8, 1983, Puritan confirmed that seven respirator serial numbers were fraudulent. Petitioner's involvement with Mr. Lipschutz did not end with the signing of the February 1983 agreement. In April or May of 1983, Mr. Lipschutz contacted Mr. Berk and informed him that he was due money as a result of an accident and that he would be willing to repay petitioner some of what he owed him. Mr. Lipschutz explained to Mr. Berk that the funds from the accident were only payable in the form of a certificate of deposit (CD) and that he would be willing to have petitioner stated as the owner of the CD in exchange for immediate cash. A day or so later, Mr. *565 Lipschutz visited Mr. Berk at his office and brought with him a $ 75,000 CD from the Philadelphia Savings Fund Society (PSFS) payable to petitioner 91 days from issuance. Mr. Berk called PSFS and verified that a $ 75,000 CD was issued by PSFS in the name of petitioner. Mr. Berk then contacted petitioner, who agreed to purchase the CD from Mr. Lipschutz. Using Mr. Berk as a middle man, Mr. Lipschutz received from Lauren-Beth $ 11,000 and, 4 days later, $ 26,000. The difference between the $ 75,000 and the $ 37,000 advanced was to be petitioner's profit on the near 90-day loan. Mr. Lipschutz returned to Mr. Berk on three other occasions. On each occasion, Mr. Lipschutz had a 90-day or so CD from a different bank that was made payable to petitioner: A $ 50,000 CD from Home Unity Savings; a $ 25,000 CD from Trevose Bank; and a $ 75,000 CD from Germantown Savings Bank. Against these three CD's, Mr. Lipschutz received $ 30,000, $ 17,200, and $ 40,200. In all, Mr. Lipschutz received $ 124,400 against CD's with a reported value of $ 225,000. When petitioner attempted to redeem the CD's, he discovered that they were all fraudulently obtained and, accordingly, worthless. Mr. Lipschutz *566 had purchased the CD's with checks drawn on accounts with insufficient funds. Again, petitioner did not file criminal charges or attempt to collect from Mr. Lipschutz. In summary, petitioner or his corporations advanced Mr. Lipschutz the following amounts between the years 1981 and 1983: Year
Amount
1980
$ 26,020
1981
188,290
1982
254,500
1983
124,400
On or about January 26, 1984, Mr. Lipschutz and his wife instituted a bankruptcy proceeding. Petitioner did not file a proof of claim in the bankruptcy proceeding. 2. Investment Activities
In addition to lending money, petitioner used Living Better to purchase IVB commercial paper and Eurodollars. [17] Apparently, IVB did not issue a Form 1099 with regard to the purchase of IVB commercial paper or Eurodollars in an amount that exceeded $ 100,000. Accordingly, investments by Living Better in IVB commercial paper or Eurodollars were for $ 100,000 or more. From such investments, during 1979 and 1980, Living Better earned $ 36,066 and $ 55,727, respectively, in interest income. *567 In October 1980, petitioner opened a joint bank account at the Philadelphia Branch of Bank Hapoalim in the name of Abe Serot and Lauren Beth Serot (Abe-Lauren account). [18]Bank Hapoalim is an international bank that is based in Tel Aviv, Israel, and has branches in many parts of the world, including the Cayman Islands. During October 1980, petitioner transferred $ 750,000 from Living Better into the Abe-Lauren account at Bank Hapoalim. In May 1982, petitioner deposited another $ 250,000 into the account from unknown sources. On May 4, 1981, petitioner opened a different account at Bank Hapoalim in the name of petitioner and Sylvia Serot, petitioner's spouse (Abe-Sylvia account). [19] The next day, petitioner deposited $ 25,000 into the account, $ 5,000 of which came from Living Better. Over the next *568 5 months, petitioner deposited an additional $ 198,330. In total, $ 223,330 was deposited into the Abe-Sylvia account at Bank Hapoalim, and of that $ 223,330, over $ 110,000 came from Living Better. Petitioner requested that the funds at Bank Hapoalim be transferred to the Cayman Islands' branch. Petitioner used the Cayman Islands' branch to invest in foreign funds being offered by Bank Hapoalim, primarily in Eurodollars. The Cayman Islands' branch offered an interest rate approximately one-half to 1 percent higher than the interest rates offered by U.S. banks. Bank Hapoalim did not generate a Form 1099 for funds deposited with its Cayman Islands' branch. During 1980, 1981, and 1982, petitioner earned interest income from his investment at Bank Hapoalim in the amounts of $ 16,349, $ 131,491, and $ 137,007, respectively. Nearly *569 all of the amounts earned in the Bank Hapoalim accounts during the years 1980 through 1982 were either reinvested into the accounts from which they came or directly deposited to Living Better or Lauren-Beth. Between the time when the accounts at Bank Hapoalim were opened and 1982, a total of $ 726,487 was disbursed from the accounts at Bank Hapoalim. Of the $ 726,487 disbursed, $ 103,254 was transferred to Living Better, and $ 219,274 was transferred to Lauren-Beth. Petitioner also willfully failed to report the interest income earned in Living Better's account at IVB and at Bank Hapoalim on his Federal income tax returns for the years 1979 through 1982. On June 3, 1985, following a 5-day jury trial, petitioner was convicted on four counts of tax evasion for the years 1979, 1980, 1981, and 1982, and four counts of making and subscribing to false tax returns for the same years. The conviction relates to his failure to report investment income earned by Living Better at IVB and Bank Hapoalim, and not to his failure to report the income from his lending activities. OPINION Issue 1. Disregard of Corporations
The first issue for decision is whether Lauren-Beth and Living *570 Better should be disregarded for Federal income tax purposes. Respondent contends that, for the purposes of the investment income earned by Living Better, the corporation should be disregarded and the income attributed to petitioner individually. On this point, petitioner agrees with respondent. Inexplicably, respondent contends, however, that, for purposes of any income or losses relating to the lending activities conducted by Living Better, the corporation should be recognized as a separate and distinct entity from petitioner. On this point the parties disagree. Generally, a corporation, including one wholly owned by one shareholder, is a taxpayer separate and distinct from that shareholder. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 442 (1934); Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 419-420 (1932). A corporation is to be respected as a taxable entity separate and distinct from its owners where the corporation either is formed for a business purpose or carries on a business purpose after the corporation is formed. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943). *571 The corporate business purpose or the quantum of business activity required for recognition of the separate existence of the corporation is generally rather minimal. Hospital Corp. of America v. Commissioner, 81 T.C. 520, 579-580 (1983); Strong v. Commissioner, 66 T.C. 12, 24 (1976), affd. without published opinion 553 F.2d 94 (2d Cir. 1977). The general rule is that a taxpayer, having chosen the advantages of a corporation in which to do business, must also accept the disadvantages of that choice. Higgins v. Smith, 308 U.S. 473, 477 (1940). However, there is an exception to the general rule where the corporation will not be recognized for Federal income tax purposes. Ogiony v. Commissioner, 617 F.2d 14, 16 (2d Cir. 1980), affg. and remanding T.C. Memo. 1979-32; Noonan v. Commissioner, 52 T.C. 907, 910 (1969), affd. per curiam 451 F.2d 992 (9th Cir. 1971). In circumstances where the corporation is merely a passive dummy or is used solely for *572 tax avoidance purposes, the corporate form will be disregarded. Jackson v. Commissioner, 233 F.2d 289, 290-291 (2d Cir. 1956), affg. 24 T.C. 1 (1955); Strong v. Commissioner, supra at 22; Marcus v. Commissioner, T.C. Memo. 1992-234. We find that the situation in these consolidated cases falls within the exception to the general rule. Based on the record before us, we conclude that Living Better and Lauren-Beth were used during the years in issue solely as vehicles for petitioner to avoid paying Federal income taxes. The corporations were nothing more than bank accounts that petitioner used to fraudulently hide his income from the Government. See Marcus v. Commissioner, supra.Petitioner never considered the corporations separate and distinct entities from himself. The corporations never filed Federal income tax returns and, as to the State, they claimed to be inactive. Petitioner never observed any corporate formalities. He moved money back and forth among the corporate accounts and his personal accounts, paying business *573 and personal expenses from either. Furthermore, we conclude that respondent's attempt to disregard the corporation only with respect to the investment income is untenable. We have found no cases, and respondent has cited no cases, where a corporation was to be disregarded only for certain business activities and only for selected years. We are unwilling to hold that with respect to a single bank account some of its earnings are personal to the major stockholder and some are corporate. Issue 2. Trade or Business of Lending Money
Having concluded that the corporations should be disregarded for tax purposes, the second issue for decision is whether petitioner was in the trade or business of lending money during the years 1979 through 1982. Section 166(a) allows a deduction for a business debt that becomes worthless during the taxable year. Section 166(d)(2), which defines a nonbusiness debt, by implication defines a business debt as a debt created or acquired in connection with a trade or business of the taxpayer, or a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. For petitioner to be entitled to a business bad debt deduction, *574 he must first establish that he was in the trade or business of lending money during the years in question. This Court has held that a trade or business of lending money is limited to those "exceptional" situations where the taxpayer's lending activities are "so extensive and continuous as to elevate that activity to the status of a separate business." Imel v. Commissioner, 61 T.C. 318, 323 (1973); Sales v. Commissioner, 37 T.C. 576, 580 (1961); Rollins v. Commissioner, 32 T.C. 604, 613 (1959), affd. 276 F.2d 368 (4th Cir. 1960). Some of the factors which have been considered in determining whether a taxpayer is engaged in the trade or business of lending money include: The total number of loans made; the time period over which such loans were made; the adequacy and nature of the taxpayer's records; whether the loan activities were kept separate and apart from the taxpayer's other activities; and whether the taxpayer sought out the lending business. Ruppel v. Commissioner, T.C. Memo. 1987-248; McCrackin v. Commissioner, T.C. Memo. 1984-293. *575 We have also considered the amount of time and effort expended in pursuit of the lending activity and the relationship between the taxpayer and his debtors. See Zivnuska v. Commissioner, 33 T.C. 226, 237-238 (1959); Fuller v. Commissioner, 21 T.C. 407, 412-413 (1953); see also United States v. Henderson, 375 F.2d 36, 41 (5th Cir. 1967). We find that the number of loans and the amounts advanced by petitioner are indicative of one in the trade or business of lending money. Not including the loans to Mr. Lipschutz, Mr. Tuchinsky, and Control, between the years 1976 and 1986, petitioner made approximately 55 separate loans, involving approximately $ 1,200,000. Between 1979 and 1982, again not including the loans to Mr. Lipschutz, Mr. Tuchinsky, and Control, petitioner was still able to make approximately 15 other loans. Over the same time, petitioner advanced nearly $ 750,000 just to Mr. Tuchinsky, his corporations, and Mr. Lipschutz. Respondent argues that petitioner's failure to maintain comprehensive records of his lending business demonstrates that he was not in the trade or business *576 of lending money. We agree that petitioner's records with respect to his lending activities are inadequate and disorganized. He did not maintain separate books of his lending activities. Relying on petitioner's records, we are unable to determine the total amount of his income or losses for the years 1979 through 1982. Yet, the records are sufficient for us to reasonably determine the extensiveness of petitioner's lending activities. The records maintained by petitioner are voluminous. On the whole, they do demonstrate a long history of lending money. In light of the other factors, we do not find petitioner's failure to maintain accurate records dispositive on this issue. Although petitioner did not advertise his lending services to the general public, he did actively seek out lending opportunities. He was known in the community as an individual willing to make loans to those unable to qualify for bank loans. Petitioner received referrals from bankers, title companies, his lawyer, and frequently from "bird-doggers". Moreover, lending money was clearly petitioner's primary business activity during the late 1970s and early 1980s. Petitioner devoted approximately 40 to 50 *577 hours per week to his lending activities. Most of petitioner's working day was spent generating loans or collecting on loans already made. The lack of any relationship between petitioner and those he lent money to is another indication that he was in the trade or business of lending money. Petitioner was not related to any of the individuals who received money from him, and he did not have an interest in any of the companies that received money from him, other than that of a creditor. Based on the foregoing, we conclude that petitioner was in the trade or business of lending money between 1979 and 1982. Issue 3. Claimed Bad Debt Losses
The third issue for decision is whether petitioner actually incurred any bad debt losses, and, if so, in what amounts. A bad debt is deductible in the taxable year during which the debt becomes wholly or partially worthless. Sec. 166(a). The burden of proving that the debt is worthless and the year the debt became worthless is on the taxpayer. Rule 142(a); Mueller v. Commissioner, 60 T.C. 36, 41 (1973), affd. in part, revd. in part and remanded 496 F.2d 899 (5th Cir. 1974). *578 There is no standard test or formula for determining the worthlessness of a debt within a given taxable year; the determination must depend upon the particular facts and circumstances of each case. Crown v. Commissioner, 77 T.C. 582, 598 (1981). However, it is generally accepted that the year of worthlessness is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery. Id. at 598; Federated Graphics Cos. v. Commissioner, T.C. Memo. 1992-347. We will first address the worthlessness of the Tuchinsky corporate loans. Petitioner contends that the Tuchinsky corporate loans were worthless in the years the businesses receiving the loans ceased operation, as stated by Mr. Tuchinsky in his revised affidavit. Respondent argues that petitioner has failed to prove either that the corporate loans to Mr. Tuchinsky are worthless, or when they became worthless. Respondent contests the accuracy of the revised affidavit. There is no need for us to address the accuracy of either of the Tuchinsky affidavits. We find that petitioner failed to demonstrate *579 that he has incurred any loss on the Tuchinsky corporate loans. One reason is that petitioner commonly received collateral in the form of stock of a Tuchinsky corporation other than the corporation actually receiving the loan. Where a creditor takes collateral or otherwise secures a loan, there can be no worthlessness of the debt until the security itself becomes worthless. Orrell v. Commissioner, T.C. Memo. 1979-129; Jessup v. Commissioner, T.C. Memo. 1977-289; see Hunt v. Commissioner, 33 B.T.A. 946, 950-951 (1936); 8 Mertens, Law of Federal Income Taxation, sec. 30.80 at 208-209 (1989 rev.). Petitioner claimed losses on loans to the Tuchinsky corporations in the total sum of $ 132,599. If the Tuchinsky corporate loan losses are only as much as petitioner claims, there is no evidence that petitioner actually suffered any loss. Mr. Tuchinsky listed the collateral held by petitioner as having a total value of $ 187,000, which would eliminate any loss by petitioner. We note that petitioner has failed to adequately explain why Mr. Tuchinsky stated that he owed $ 490,000 to petitioner *580 in 1989. Petitioner argues that we should reject Mr. Tuchinsky's April 1989 letter as a self-serving attempt to inflate the value of the collateral and, accordingly, to lower the amount of his total debts. Based on the evidence, it appears that the value assigned by Mr. Tuchinsky to petitioner's collateral was less than the actual market value. One month later, petitioner was able to sell stock in Amglo Industries, which Mr. Tuchinsky valued at $ 37,000, for over $ 56,000. We also find that the majority of petitioner's testimony with respect to the Tuchinsky loans is not credible. Petitioner seemed to frequently forget repayments made by Mr. Tuchinsky. Petitioner stated that he was not paid by Mr. Tuchinsky. Yet, between 1979 and 1982, he received at least $ 102,679, not including the $ 24,200 from MM. When asked to explain the discrepancy, petitioner stated that the $ 102,679 in payments related to other loans, but failed to produce evidence of other such loans and simply ignored the $ 24,200 MM payment. We next turn to the question as to whether the Control loan was worthless. Petitioner claims that, in retrospect, after evaluating his legal claim, the Control loan became *581 worthless in 1980 when his case against Morgan was originally dismissed. We conclude that petitioner's debt to Control became worthless when the Pennsylvania Supreme Court denied his petition for review in 1982. Until such time petitioner had a reasonable prospect of recovery. The debt was not rendered worthless merely because petitioner did not attempt to collect his loan from Control, as contended by respondent. Legal action is not required where all circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment. Sec. 1.166-2(b), Income Tax Regs. While we have some doubts in this area, petitioner did expend substantial sums of money to pursue a legal action against Morgan in an attempt to collect from them. Petitioner chose not to initiate collection activities against Control because he felt to do so would be futile. There is no evidence that petitioner's decision in this regard was unreasonable or unwarranted, although his reasons for not proceeding against Control were left unexplained. Issue 4. Claimed Theft Loss
The fourth issue is *582 whether petitioner incurred a theft loss on the loans to Mr. Lipschutz. Section 165 allows as a deduction a theft loss sustained during the taxable year and not compensated for by insurance or otherwise. Sec. 165(a), (c)(3). Section 165(e) provides that the deduction for such loss shall be treated as sustained in the taxable year in which the taxpayer discovered the loss. Sec. 1.165-8(a)(2), Income Tax Regs. A loss is considered to be discovered when a reasonable person in similar circumstances would have realized the fact that a loss due to theft had occurred. Cramer v. Commissioner, 55 T.C. 1125, 1134 (1971). The issue of whether a theft loss occurred must be determined under the laws of the State or other jurisdiction wherein the loss was allegedly sustained. West v. Commissioner, 88 T.C. 152, 162 (1987); Paine v. Commissioner, 63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975); Farber v. Commissioner, T.C. Memo. 1987-267. The nature of a theft, whether it be larceny, embezzlement, obtaining *583 money by false pretense, or other wrongful deprivation of property of another, is of little importance provided it constitutes a theft. Edwards v. Bromberg, 232 F.2d 107, 111 (5th Cir. 1956); Monteleone v. Commissioner, 34 T.C. 688, 692-693 (1960); sec. 1.165-8(d), Income Tax Regs.
Pennsylvania law defines "theft by deception", in relevant part, as follows: A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally: (1) creates or reinforces a false impression, including a false impression as to law, value, intention, or other state of mind * * *
18 Pa. Cons. Stat. sec. 3922(a) (Purdon 1983). A theft by deception occurs if an individual induces another to lend him money, with no intention of repaying that money. E.g., Commonwealth v. Atwood, 411 Pa. Super. 137, 601 A.2d 277, 286 (1991); Commonwealth v. Edwards, 399 Pa. Super. 545, 582 A.2d 1078 (1990). A theft loss is deductible regardless of whether the alleged theft is prosecuted *584 so long as there was an illegal taking of property under the laws of the State where the loss occurred. Viehweg v. Commissioner, 90 T.C. 1248, 1253 (1988); Bagur v. Commissioner, 66 T.C. 817 (1976), remanded 603 F.2d 491, 501 (5th Cir. 1979). A criminal conviction is not a necessary element of the taxpayer's proof in this Court. Monteleone v. Commissioner, supra at 694. Respondent disputes petitioner's claim of a theft by Mr. Lipschutz. Respondent points to the numerous discrepancies in the documents provided by petitioner, and his demonstrated lack of credibility. Respondent concludes that petitioner must have been an active participant in some scheme of Mr. Lipschutz' and not a victim, as he claims. We do share respondent's skepticism with respect to the Lipschutz loans. However, there are many aspects of petitioner's loans to Mr. Lipschutz that do make sense. In these cases, we have more than the self-serving statements of petitioner and the conflicting documents. Mr. Berk and, in particular, Mr. Lipschutz, confirmed essential elements of petitioner's *585 claim. Mr. Lipschutz admitted borrowing money from petitioner using as security fraudulent leases and nonexistent or fully collateralized equipment. He conceded that when he borrowed the money he did so with no expectation or ability to repay the amounts borrowed. With regard to the equipment, at one point, Mr. Lipschutz stated on cross-examination: I am trying to say that a lot of these transactions [petitioner] was -- unfortunately he had thought that he had collateral on this equipment, but a lot of the times the equipment was never purchased, the money was used for something else, or the equipment was already owned by PERC and already had a lien on it from the banks.
The remainder of Mr. Lipschutz' testimony makes it clear that when he stated "a lot of the times", he meant all the time. Respondent has offered no plausible reason for us to disregard Mr. Lipschutz' testimony on this point. We found Mr. Berk to be a credible and trustworthy witness. Mr. Berk, who has been practicing law in the Philadelphia area for nearly 50 years, was petitioner's attorney during the relevant years. Mr. Berk further corroborated Mr. Lipschutz' testimony and confirmed many of the key *586 elements of petitioner's claim. In particular, in late 1982, Mr. Berk stated that he undertook an extensive investigation of Mr. Lipschutz. As a result of his investigation, he discovered that equipment petitioner assumed he owned as security was either nonexistent, owned by other entities, or already fully collateralized. Based on the record, we find and hold that there was a theft by Mr. Lipschutz under Pennsylvania law. Having concluded that a theft occurred, we must determine the year that the theft was discovered. Respondent contends that, assuming there was a theft, it was not confirmed or discovered until 1983. Respondent emphasizes that the Puritan letter, which states that seven of the respirator serial numbers were fraudulent, was not received until February 1983 and that the agreement, in which Mr. Lipschutz admitted owing Lauren-Beth $ 415,00, was also not signed until February 1983. Any loss from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss. Cramer v. Commissioner, supra; sec. 1.165-1(d)(3), Income Tax Regs. We do not find the Puritan letter dispositive. Mr. Berk's investigation *587 into the accuracy of the serial numbers was only one part of his total investigation conducted on behalf of petitioner. Mr. Berk credibly testified that he discovered in late 1982 that petitioner had been swindled by Mr. Lipschutz. The agreement to pay the money back just happened to be signed in 1983. Accordingly, we conclude the theft regarding the loans was discovered in 1982. The loss with respect to the CD's are not deductible in 1982 as the transactions did not occur until 1983. We must now decide the amount of the loss suffered. Once again, petitioner appears to have overlooked repayments made on his loans. While we find that petitioner lent $ 468,810 to Mr. Lipschutz between 1979 and 1982, we also find that Mr. Lipschutz repaid $ 131,875 [20] to petitioner, resulting in a loss of $ 336,935. We find *588 that the remainder of respondent's arguments denying the theft loss have no merit. Issue 5. Whether Petitioner's Losses Offset Income
The last issue for decision is whether the losses from the Control and Lipschutz transactions are sufficient to offset petitioner's earnings from his lending activities and his investments. Petitioner concedes that the earnings from his lending activities cannot be determined. However, he argues that his losses on the Control and Lipschutz loans are so large as to completely -- or nearly completely -- offset earnings from his investments and lending activity, whatever that income may be. Deductions are strictly a matter of legislative grace. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). The taxpayer bears the burden of proving that the Commissioner's determination in the statutory notice of deficiency is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Section 6001 requires that every person liable for any tax shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time *589 to time prescribe. Section 1.6001-1, Income Tax Regs., provides that any person subject to tax shall keep such permanent books of account or records as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information. See DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992). The records required shall be kept accurately, but no particular form is required for keeping such records. Sec. 1.6001-1, Income Tax Regs.
Petitioner has submitted records of his lending activities during the 1970s and 1980s. Approximately 71 loan files relate to what petitioner considered to be very profitable loans. However, these loan files are disorganized and in complete disarray. From these loan files it is impossible to determine the amount of income petitioner earned. Petitioner has also introduced evidence of other loans that he made during the same years. The record with respect to these particular loans is significantly better. From these records, we are able to determine that petitioner suffered *590 large losses. Petitioner is required to maintain records establishing his gross income, not just his losses. Sec. 6001; sec. 1.6001-1, Income Tax Regs. Petitioner, either consciously or due to inadequate record keeping, has failed to submit records from which his gross income could be determined. Without being able to determine petitioner's gross income, we are unable to conclude that petitioner's losses offset such income. For us to conclude otherwise would be no more than mere speculation on our part. Therefore, we conclude that petitioner has failed to meet his burden of proof, and we sustain respondent's determinations. We note in closing that we found it very peculiar that petitioner's records of transactions from which he concedes he has earned substantial income are incomplete and in disarray while his records from which he claims offsetting losses are complete, at least complete enough for us to reasonably determine that a loss was incurred. To reflect the foregoing and concessions made by petitioner, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. The fraud addition to tax for 1982 is codified under sec. 6653(b)(1) and (2).↩
2. Petitioner concedes that he failed to report interest income for the years 1979 through 1982 in the amounts of $ 36,066, $ 72,077, $ 131,492, and $ 137,077, respectively. He also concedes that he is estopped from denying fraud for the years 1979 through 1982 because of a prior criminal conviction for those years.↩
3. The deficiencies for the years 1985 and 1986 relate solely to respondent's disallowance of a claimed net operating loss carry forward from 1982 related to petitioner's lending activities.↩
4. The corporation was named after petitioner's only daughter, Lauren Beth Serot.↩
5. It is unclear whether the corporations filed inactive State returns in earlier years.↩
6. In 1984, petitioner also entered into an accounts receivable factoring relationship with Yellow Limousine Services, Inc. (Yellow), of Philadelphia. The agreement provided that petitioner would advance funds against Yellow's accounts receivable. As Yellow received payments on the accounts receivable, it was responsible for transferring such payments to petitioner.↩
7. Petitioners provided to Tuchinsky's corporations the following amounts: ↩
Year
Amount
1979
$ 10,000
1980
8,250
1981
94,729
1982
19,620
8. The following amounts were loaned to Mr. Tuchinsky personally during 1979 through 1982: ↩
Year
Amount
1979
$ 6,500
1980
14,500
1981
98,766
1982
50,600
9. Until Mr. Tuchinsky's death on May 9, 1990, petitioner considered the personal loans to be collectible. Petitioner stated he presumed that at some point in time Mr. Tuchinsky would repay the amount owed.↩
10. The letter is directed to petitioner and refers to the outstanding balance due from Mr. Tuchinsky as being owed to petitioner. It is unclear whether the outstanding balance includes personal loans, as the amount claimed to be owed by Mr. Tuchinsky is greater than the amount that petitioner claimed Mr. Tuchinsky owed him.↩
11. The affidavit included the following information: ↩
Corporate Name
Loan Date
Amount
Failure Year
Turning Basin, Inc.
2/08/80
$ 4,000
1981
Turning Basin, Inc.
3/09/81
17,000
1981
Carpet Buyers, Inc.
5/26/81
20,000
1981
Blue Mountain Exp.
8/10/81
8,629
1981
OCS Recovery Systems
8/13/81
10,000
1981
Guardian Inv. Corp.
8/14/81
4,600
1981
Willowick Management
6/14/82
6,420
1982
Morbet Management Corp.
7/19/82
4,000
1982
12. The revised affidavit added the following information: Name
Loan Date
Amount
Failure Year
Veronics, Inc.
1/05/79
$ 4,000
1979
Veronics, Inc.
1/25/79
6,000
1979
Turning Basin, Inc.
2/06/80
4,250
1981
Turning Basin, Inc.
4/20/81
8,000
1981
Turning Basin, Inc.
4/24/81
6,000
1981
Turning Basin, Inc.
7/10/81
6,500
1981
Best Energy Systems Inc.
8/14/81
5,000
1981
Turning Basin, Inc.
10/05/81
3,500
1981
Turning Basin, Inc.
10/07/81
3,000
1981
Market Management, Inc.
10/31/81
2,500
1982
Market Management, Inc.
5/17/82
3,000
1982
Market Management, Inc.
6/14/82
3,700
1982
Market Management, Inc.
7/19/82
4,000
1982
Market Management, Inc.
8/30/82
2,500
1982
Morbet Management Corp. was not listed on the revised affidavit.↩
13. Petitioner became involved in the loan through a referral by Herbert Bagley, a loan officer at Southeast National Bank. Mr. Bagley referred clients to petitioner when the bank was unable to make the individual or entity a loan. In the early 1980s, Mr. Bagley was investigated for banking law violations. In connection with that investigation, Mr. Bagley referred the Government investigators to petitioner for possible income tax violations.↩
14. At the end of 1979, there is evidence that Mr. Lipschutz already owed petitioner $ 7,320. In Jan. 1981, Mr. Lipschutz gave Living Better a check in the amount of $ 7,320. The check was returned for insufficient funds. Considering petitioner's interest rates, there is no way of determining the amount of the loan.↩
15. In 1983, the Bear I ventilators purchased from Oxymed were listed as assets of Medical Rental Co. (MRC), a subsidiary of PERC. Mr. Lipschutz did not have an interest in MRC in 1983.↩
16. On Nov. 29, 1982, St. Mary's Hospital informed Mr. Berk that no person by the name of C.C. Kurtz had ever been associated with the hospital.↩
17. The IVB account was opened on the recommendation of Mr. Bagley, who had left Southeast National Bank.↩
18. Lauren Beth Serot did not file income tax returns for the years 1979 and 1980. She did file returns for the years 1981 and 1982, but did not report any of the interest from IVB or Bank Hapoalim in either year.↩
19. Sylvia Serot filed separate Federal income tax returns for the years 1979 through 1982. She did not report any of the interest income from IVB or Bank Hapoalim for the years in issue.↩
20. The $ 131,875 is the sum of the $ 13,125 payment under the lease assignment, the $ 35,000 payment on July 27, 1981, and additional payments of $ 63,750 and $ 20,000 during the first week of July 1982.↩