T.C. Summary Opinion 2001-183

UNITED STATES TAX COURT

MEHDI H. HAJIYANI, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5818-00S.                    Filed December 12, 2001.

Mehdi H. Hajiyani, pro se.

<u>Roger W. Bracken</u>, for respondent.


DEAN, <u>Special Trial Judge</u>:  This case was heard pursuant to
the provisions of section 7463 of the Internal Revenue Code in
effect at the time the petition was filed.  Unless otherwise
indicated, subsequent section references are to the Internal
Revenue Code in effect for the years at issue, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined deficiencies in petitioner's Federal income taxes of $4,256, $6,858, and $16,977 for 1992, 1993, and 1994, respectively. The issues for decision are whether petitioner: (a) Was in the trade or business of lending money; (b) and if so, is entitled to deductions for business expenses, business bad debts, and the net operating losses therefrom; and (c) is entitled to deduct real estate rental losses in excess of $25,000. Our resolution of these issues will determine the computational issue of whether petitioner is entitled to credit for the elderly or disabled under section 22 in 1992 or 1993.

## Background

The stipulation of facts and the accompanying exhibits are incorporated herein by reference. Petitioner resided in Rockville, Maryland, at the time his petition was filed in this case.

Since 1971 petitioner has been employed as an associate professor of chemistry at the University of the District of Columbia (UDC). Petitioner was generally engaged in his professorial duties from the middle of August through the middle of May. In some years, petitioner taught evening classes and in others, day classes. Because of the lack of a graduate chemistry

program at UDC, petitioner had no research responsibilities requiring additional time commitments to the school.

From 1985 through 1994, petitioner reported interest income from loans. He made or purchased notes representing 75 loans in amounts varying from $1,600 to $175,000.

Beginning in 1976, petitioner also engaged in purchasing residential real estate for leasing and for resale.

Petitioner used an enclosed deck off his master bedroom as an office for his professorial, loan, and real estate activities. The office had a desk, a home telephone extension, a copy machine, a computer, and miscellaneous items.

Petitioner's Money-Lending Activity

Petitioner reported income from lending money beginning in 1985. For each of the years 1992 and 1994, petitioner filed a Federal income tax return to which he attached a Schedule C, Profit or Loss From Business, reporting interest income from his loan activity of $20,691 and $4,215 respectively. For 1993, petitioner received interest income from the notes he was holding in the total amount of $42,597. Petitioner, however, offset against his interest income an amount claimed for bad debts of $776,525 to arrive at a net bad debt loss of $733,928 reported on Schedule C. After adding the loss to claimed business expenses of $28,103, petitioner reported on Schedule C a net loss from business of $762,031 for 1993.

Respondent determined that petitioner had not established the existence or bases of his loans, that they were related to a trade or business, or that they became wholly worthless in 1993. Respondent disallowed petitioner's bad debt deduction in 1993 and instead allowed a $3,000 investment loss on Schedule D, Capital Gains and Losses, in each of the years 1992, 1993, and 1994.

The loans for which petitioner claimed the bad debt deduction in 1993 fall into five general categories:  (1) A group of 30 loans to real estate broker Dominick Aloi (Aloi debt); (2) loans made in connection with the used-car business of Donald Tooke (Tooke loans); (3) real estate loans made to individuals, secured by mortgages or deeds of trust; (4) an unsecured loan made to an individual; and (5) personal loans made to friends and acquaintances.

### The Aloi Debt

Dominick Aloi was a real estate broker or agent who in 1990 owned and operated the Nick Aloi Real Estate Co. in Frederick, Maryland.  Between May and August of 1990, Mr. Aloi executed a series of 30 promissory notes totaling $512,700.  The notes did not represent new loan proceeds but were instead renewed promises on unpaid loans made in earlier years.  In the 2 years prior to 1990, Mr. Aloi had not been making full payments on the loans. The notes were short-term notes, usually for 30 days, were often renewed more than once, and gradually grew in number to 30.  The

face amounts of the notes often exceeded the loan proceeds the borrower received.  Two of the "new" notes, both dated July 11, 1990, are promises to pay unpaid interest on earlier loans.

Petitioner and Mr. Aloi had worked together on some real estate deals in prior years.  During the course of their relationship, petitioner made between 50 and 80 loans to Mr. Aloi.  Because of their previous dealings, when he made the loans at issue here, petitioner did not receive a loan application from Mr. Aloi, request a financial statement, require collateral, or check the credit references of Mr. Aloi.

In November of 1991 petitioner filed against Mr. Aloi, in the Circuit Court for Frederick County, Maryland, a Complaint for Confession of Judgment for the face amount on notes including the 30 described above.  Among other allegations in response, Mr. Aloi alleged that the interest rate on some of the notes was usurious.  The court agreed that interest on some of the notes was usurious, assessed monetary penalties against petitioner, and in February of 1995 entered judgment against Mr. Aloi to the extent of $474,140.38.

Since February 27, 1995, petitioner has received nominal payments on the judgment he obtained against Mr. Aloi.  On August 7, 1996, Mr. Aloi, petitioner, and Dr. Douglas Tavenner (another judgment creditor of Mr. Aloi) executed an agreed payment

schedule for allocating payments by Mr. Aloi on their respective judgments.

The Tooke Loans

Mr. Tooke, doing business as Alliance Leasing Co. (Alliance), solicited investors through a Houston newspaper advertisement to finance his purchase of used cars for resale (floor planning). He also sought financing for buyers who wanted to purchase his used cars. Petitioner and Mr. Tooke eventually agreed that petitioner would guarantee up to $30,000 of floor-planning debt with Independence Bank, N.A. (bank).

On or about May 10, 1989, the bank granted a line of credit to Mr. Tooke to finance his floor planning. Petitioner guaranteed Mr. Tooke's promissory note by pledging as security with the bank a $30,000 certificate of deposit (CD).

Beginning in November of 1989, Mr. Tooke defaulted on his loan agreement with the bank. In December of 1989, petitioner sued Mr. and Mrs. Tooke and the bank seeking repayment of the loans made to Mr. Tooke and the return of the $30,000 CD that he had pledged as security for the Tooke loan. The bank notified petitioner that it intended to foreclose on the CD and on June 5, 1990, filed a counterclaim against Mr. Tooke and petitioner. Petitioner thereafter agreed to the liquidation of his CD and paid attorney's fees to the bank. Because of the illness of Mr. Tooke and his lack of assets, petitioner's lawyer, in a letter

dated June 4, 1991, recommended that he also reach a settlement with Mr. Tooke.

As part of his business, Mr. Tooke provided financing to buyers of his used cars. During their business relationship, petitioner purchased used-car-buyers' notes from Mr. Tooke at a discount. When Mr. Tooke sold a car on credit, he would accept a promissory note for the amount of the loan and place a lien on, and retain title to, the vehicle sold. He would then sell the note to petitioner for an amount less than the face amount of the note. Petitioner would receive the note, the lien, and the title to the vehicle.

During 1989 petitioner purchased from Mr. Tooke 10 discounted auto loan notes. Before the end of 1989 all 10 of the borrowers on the notes petitioner purchased from Mr. Tooke had defaulted on their payments to petitioner. For all loans save one, petitioner received title to the financed vehicle. Of the nine for which he received title, petitioner retains the title to all except one for which he received payment of $800 on April 27, 1992. During 1992, four of the vehicles were the subject of notice to petitioner by mechanics lienors that they intended to foreclose on the vehicles because of unpaid bills for towing, storage, or repairs. Petitioner did not pay any of the claims and permitted the liens to be foreclosed.

Real Estate Loans

Petitioner worked primarily through a loan or mortgage broker. The loan broker solicits both lenders and borrowers through various methods, including advertisements. Typically, higher risk borrowers will go to a loan broker to obtain a loan, and the broker will in turn seek a lender like petitioner. Usually the broker will collect all the information about the borrower, including a loan application and credit check, and then send a "package" to the potential lender for consideration. The lender may then meet with the borrower to negotiate the interest rate and to go to settlement. The loan broker charges a fee that is paid by the borrower.

The Daniels Loan

In April of 1991 James and Suzanne Daniels (the Danielses) executed a promissory note in the amount of $12,500 payable to Merwin Coad secured by a deed of trust. At the time of this loan, the property was burdened by an existing first deed of trust in favor of Redstart Corp. (Redstart). Merwin Coad sold the Danielses' second deed of trust note to petitioner. In June of 1991 Redstart informed petitioner that the Danielses were in default on their first deed of trust note.

On July 23, 1991, petitioner authorized a foreclosure sale of the Daniels property in an attempt to ensure payment of the debt due to him, secured by a second deed of trust. Notice of

the trustee sale was published on August 19, 22, and 28, 1991, and the auction was held on August 29, 1991. There were no bids, and petitioner retained his lien interest in the Daniels property at the date of trial.

### The Brown Loans

In July of 1991 petitioner lent Robert and Megan Brown (the Browns) $9,500 toward the purchase of an interest in a cooperative located in Washington, D.C. The Browns gave petitioner a promissory note in the face amount of $10,000 bearing annual interest of 18 percent. Petitioner received a security interest in the Browns' cooperative. At the time of petitioner's loan, the cooperative was encumbered by an existing security interest for an earlier loan of $83,000 made by NCB Savings Bank (NCB).

On August 1, 1992, petitioner and the Browns signed an agreement revising the terms of the Browns' note, increasing it from $10,000 to $15,000 to account for unpaid interest.

Petitioner was notified in October of 1993 and March of 1994 that the Browns were delinquent in making payments on their obligation to NCB.

On December 10, 1996, Mr. Brown filed a petition in bankruptcy. Under an Amended Chapter 13 Plan filed January 23, 1997, petitioner was to be paid directly by the debtor, Mr. Brown, as a secured creditor. On February 17, 1998, NCB held a

foreclosure sale of the Browns' cooperative share certificate subject to its lien.

### The Johnson Loan

On June 29, 1990, petitioner purchased a $38,000 promissory note made by Robert Johnson, which was secured by a second deed of trust. Petitioner purchased the note for $30,400. At the time petitioner purchased the $38,000 note, the Johnson property was subject to a first deed of trust securing a note of $105,155 in favor of "Barclay's American Mortgage" (Barclay's).

Petitioner foreclosed on the Johnson property to collect on his note and in February of 1994 obtained a judgment that resulted in petitioner's taking title to the property, subject to Barclay's first deed of trust. Mr. Johnson subsequently filed a petition for bankruptcy.

### The Norman/Beard Loan

On January 15, 1988, Tony Norman and Jeffrey Beard executed a promissory note payable to petitioner for $25,000 secured by a second deed of trust on property located in Washington, D.C. The borrowers received loan proceeds of $21,275. Petitioner foreclosed on the property in June of 1988, acquiring title to the property subject to a first deed of trust. After obtaining title to the property, petitioner leased the house to various tenants. On February 8, 1998, the first trust lender foreclosed on the property.

### The Fuller Loans

In October of 1990 Edwin Fuller executed a promissory note payable to petitioner for $30,000 secured by a first deed of trust on unimproved property located in the State of Maryland. In 1991, Mr. Fuller agreed to sell the property to Michael Mason subject to the deed of trust. In September of 1991, Mr. Mason executed a promissory note for $68,000 payable to petitioner secured by a first deed of trust. The $68,000 face amount of the note was to retire the Fuller note for $30,000 with the remaining $38,000 intended to fund a construction loan the proceeds of which were to be released in stages. At settlement Mr. Mason received a construction draw of $6,000.

On March 2, 1993, petitioner foreclosed on the property. Because Mr. Mason had failed to pay the required property taxes, petitioner paid property taxes of $7,147 before receiving title to the property. Petitioner, having received title to the property, sold it in 1999.

### The International Loan Network Loans

In November of 1991 petitioner purchased at a discount from Merwin Coad two promissory notes each secured by a second deed of trust on respective properties located in Washington, D.C. Each note was in the amount of $10,500 for which he paid $8,500. In 1991 the maker of the notes, International Loan Network, filed for bankruptcy. The trustee in bankruptcy subsequently

determined that the fair market values of the properties securing petitioner's loans were less than the amounts owed on the properties and abandoned them in bankruptcy. Both properties were sold at foreclosure on July 24, 1992, in order to pay the senior secured creditor.

### The Unsecured Swift Loan

For $4,500 petitioner obtained from Jed Wilbourn a note for $5,000 made by Gerald Swift in 1991. On October 18, 1993, petitioner became a judgment lien creditor of Gerald and Jolynn Swift in the amount of $20,000 with respect to the advancement to them of loan proceeds of $15,000 in 1991.

In 1996, the Swifts filed a petition for bankruptcy. Petitioner filed a proof of claim for both notes with the bankruptcy court.

### Personal Loans

#### Wooton

Petitioner lent his friends Lorenzo and Betty Wooton $4,000 for which they executed a note to him for $4,400. In June of 1991 the Wootons issued to petitioner in payment of the loan a check for $4,000 that was dishonored for nonsufficient funds.

#### Rawoof

Petitioner lent his friend Mohamed Rawoof $5,000 on January 11, 1991, to pay for utilities for apartment buildings he owned in New York. In December of 1993, Mr. Rawoof petitioned for

bankruptcy and listed petitioner as an unsecured creditor.  On May 5, 1994, petitioner was notified by the bankruptcy court that Mr. Rawoof had been discharged from certain of his debts including that to petitioner.

## Petitioner's Real Estate Activity

In 1993 petitioner owned 21 separate parcels of residential real property either individually or in partnership with his spouse.  Petitioner owned one other parcel of real estate in partnership with someone other than his spouse.  The properties were usually subject to 1-year or 6-month leases but became month-to-month upon lapse.

Petitioner reported income or loss from his real estate rental activities on Schedule E, Supplemental Income and Loss. On his Forms 1040, U.S. Individual Income Tax Return, for 1992, 1993, and 1994, petitioner reported total rental losses of $62,903, $35,456, and $82,230.[1]

## Discussion

## Petitioner's Money-Lending Activity

Respondent argues that petitioner was not engaged in the trade or business of lending money and alludes to section 183, Activities Not Engaged In For Profit.  To conclude from the record in this case that petitioner did not intend to make a

---

[1]Petitioner reported on Schedule E a total loss of $80,159, but on line 17 of the Form 1040 for 1994 he claimed a rental real estate loss of $82,230.  The discrepancy is unexplained.

profit from his lending activity would defy common sense. The Court will not reiterate all the facts and circumstances in support but finds from the record that petitioner lent money with the intent to make a profit. See Hirsch v. Commissioner, 315 F.2d 731, 737 (9th Cir. 1963), affg. T.C. Memo. 1961-256; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs.

Determining whether petitioner's lending money for profit rose to the level of a trade or business is a somewhat more difficult inquiry. That petitioner was a chemistry professor does not preclude him from also being in another trade or business at the same time. See Curphey v. Commissioner, 73 T.C. 766, 775-776 (1980). But petitioner must show not only that his primary purpose for engaging in the activity was for income or profit, but also that he engaged in the activity with "continuity and regularity". Groetzinger v. Commissioner, 480 U.S. 23, 35 (1987). In order to be considered a trade or business, petitioner's lending activity must be extensively carried on. Imel v. Commissioner, 61 T.C. 318, 323 (1973); Rollins v. Commissioner, 32 T.C. 604, 613 (1959), affd. 276 F.2d 368 (4th Cir. 1960); see also Barrish v. Commissioner, 31 T.C. 1280, 1286 (1959).

Some of the factors which have been considered in determining whether a taxpayer is engaged in the trade or business of lending money include:  The total number of loans made; the time period over which the loans were made; the adequacy and nature of the taxpayer's records; whether the loan activities were kept separate and apart from the taxpayer's other activities; and whether the taxpayer actively sought out lending business.  Ruppel v. Commissioner, T.C. Memo. 1987-248; McCrackin v. Commissioner, T.C. Memo. 1984-293.  We have also considered the amount of time and effort expended in pursuit of the lending activity and the relationship between the taxpayer and his debtors.  See Zivnuska v. Commissioner, 33 T.C. 226, 237-238 (1959); Fuller v. Commissioner, 21 T.C. 407, 412-413 (1953); see also United States v. Henderson, 375 F.2d 36, 41 (5th Cir. 1967).

The Court finds that the factors in the record are indicative of petitioner's being in the trade or business of lending money in the years 1992 through 1994.  See Serot v. Commissioner, T.C. Memo. 1994-532, affd. without published opinion 74 F.3d 1227 (3d Cir. 1995); Ruppel v. Commissioner, supra.  The Court therefore concludes that petitioner was in the trade or business of lending money during the years at issue.

Petitioner is entitled to deduct business expenses on Schedule C for the years 1992 through 1994 associated with his money-lending business.  If petitioner shows all the necessary

elements, he may also deduct the bad debts claimed for 1993.

A bad debt is deductible in the taxable year during which it becomes wholly or partially worthless. Sec. 166(a). Generally, the taxpayer must show that the debt is worthless and the year the debt became worthless. See Rule 142(a); Mueller v. Commissioner, 60 T.C. 36, 41 (1973), affd. in part, revd. in part and remanded 496 F.2d 899 (5th Cir. 1974). Petitioner has made no argument that the burden of proof shifting provisions of section 7491(a)(1), effective for Court proceedings arising in connection with examinations commencing after July 22, 1998, have application to this case, nor has he offered any evidence that he has complied with the requirements of section 7491(a)(2).

Worthlessness

There is no standard test or formula for determining the worthlessness of a debt within a given taxable year; the determination depends on the particular facts and circumstances of each case. Crown v. Commissioner, 77 T.C. 582, 598 (1981). The facts and circumstances must show both the fact and the year of worthlessness. Lucas v. Am. Code Co., 280 U.S. 445, 449 (1930); Crown v. Commissioner, supra. It is generally accepted that the year of worthlessness is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery. Crown v. Commissioner, supra at 598; Federated Graphics Cos. v. Commissioner, T.C. Memo. 1992-347. In

determining worthlessness, the value of any collateral as well as the financial condition of the debtor will be taken into consideration. Sec. 1.166-2(a), Income Tax Regs. Facts are sufficient to show worthlessness where debt is uncollectible and legal action to enforce payment would probably not result in satisfaction of a judgment. Sec. 1.166-2(b), Income Tax Regs. A debt is "worthless" where it lacks present value and appears to lack potential for collectibility at any time in the future. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972); LeLandais v. Commissioner, T.C. Memo. 1976-345. "Bankruptcy is generally an indication of the worthlessness of at least part of an unsecured and unpreferred debt." Sec. 1.166-2(c), Income Tax Regs.

Petitioner claimed the debts at issue here as a lump-sum deduction for total worthlessness on his Schedule C for 1993. Respondent argues that even if petitioner was lending money as a trade or business, he has not shown his bases in the amounts lent or established that the debts were wholly worthless in 1993.

The Court examines first the issue of worthlessness. Section 166(a)(1) provides that for debts that become wholly worthless within the taxable year "there shall be allowed" a deduction. In contrast, under section 166(a)(2) Congress has provided the Secretary with discretion. He "may allow" the deduction of a partially worthless debt in an amount "not in

excess of the part charged off within the taxable year".  See sec. 1.166-3(a)(2)(iii), Income Tax Regs.  Courts have recognized the Commissioner's discretion and will not disturb his determination unless it is plainly arbitrary and unreasonable. Sika Chem. Corp. v. Commissioner, 64 T.C. 856, 862-863 (1975), affd. without published opinion 538 F.2d 320 (3d Cir. 1976); Bullock v. Commissioner, 26 T.C. 276, 299 (1956), affd. per curiam 253 F.2d 715 (2d Cir. 1958); Findley v. Commissioner, 25 T.C. 311 (1955), affd. per curiam 236 F.2d 959 (3d Cir. 1956). Petitioner has not raised the issue of partial worthlessness of any of the specific debts here at issue, and we will not consider it.  See Mayer Tank Manufacturing Co. v. Commissioner, 126 F.2d 588 (2d Cir. 1942); accord Lehman v. Commissioner, 129 F.2d 288 (2d Cir. 1942).

Petitioner is therefore entitled to claim a bad debt deduction under section 166(a)(1) only for debts that became wholly worthless within the taxable year.  The Court, however, has examined the record and is unable to find by a preponderance of the evidence that any of petitioner's loans became wholly worthless within any of the years before the Court.

### The Aloi Debt

The group of 30 notes from Mr. Aloi to petitioner was the subject of a lawsuit brought by petitioner to reduce his claims to judgment.  The litigation proceeded through the years at

issue, and not until 1995 did the court enter judgment largely in favor of petitioner. It seems unlikely that a reasonable business person would spend substantial time and money to collect a wholly worthless debt. Petitioner still receives payments, albeit nominal in amount, on the Aloi judgment.

### The Tooke Loans

With respect to petitioner's $30,000 guarantee of the Tooke floor-planning credit line, and its attendant litigation, the parties stipulated evidence of a settlement recommendation by petitioner's attorney in June of 1991. The recommended settlement required that petitioner acquiesce in the liquidation of his collateral by the creditor. If the settlement was entered into in 1991, and there is no evidence to show otherwise, petitioner's debt became worthless in 1991. See sec. 1.166-9(a), (d), Income Tax Regs. There was no right of subrogation in the agreement between petitioner and Mr. Tooke that would delay the determination of the year of worthlessness. See sec. 1.166-9(e)(2), Income Tax Regs.

As to the 10 used-car-buyers' notes petitioner purchased from Mr. Tooke, all the borrowers defaulted in 1989. Of the nine for which he received title, petitioner retains the title to all except one which he exchanged for a payment of $800 on April 27, 1992. Petitioner testified that it was not clear when some of the notes became worthless. Petitioner had not obtained credit

or financial reports on the persons whose auto loans he bought from Mr. Tooke.  He added that he had "nothing to gain by taking action" so his attitude was, "in many cases, just wait and see what happens."  Although petitioner allowed mechanics lienors to foreclose on four of the vehicles in 1991 or 1992,[2] there is no evidence that the notes secured by the vehicles did not become worthless in years before or after the foreclosures.

A debt does not become worthless merely because the creditor elects not to enforce the obligation.  Southwestern Life Ins. Co. v. United States, 560 F.2d 627, 644 (5th Cir. 1977); Brewer v. Commissioner, T.C. Memo. 1992-530; Suman v. Commissioner, T.C. Memo. 1967-84.  Petitioner's failure to attempt collection allows the inference that the notes were already worthless in 1989, 1990, or 1991.

### Real Estate Loans

Petitioner failed to produce evidence of identifiable events that could fix the year of total worthlessness of his real estate loans.  In some instances, even if the year could be determined, we are unable to determine what the amount of the loss might have been because of partial collection in kind.  The Daniels loan was the subject of default, foreclosure, and nonsale at foreclosure

---

[2]The stipulation by the parties recites an unlikely chronology:  That petitioner received notices from mechanics lienors in 1992 and that petitioner permitted the liens to be foreclosed on the cars in 1991.

all in the year 1991. Petitioner retained a lien interest of unknown value. The Brown note was made in 1991 and renewed in 1992. The next relevant event was the filing of a petition in bankruptcy by Mr. Brown in 1996. The Johnson note was the subject of a foreclosure suit resulting in a judgment conveying to petitioner the deed of trust property of unknown value. At some later unknown date, Mr. Johnson filed for bankruptcy. Petitioner obtained title to property of unknown value securing the Norman/Beard loan in 1988 and then leased the property to various tenants until 1998. The Fuller property, of unknown worth, foreclosed on by petitioner in 1993, was sold by him in 1999 for an unknown amount. The maker of the ILN notes filed for bankruptcy in 1991, and the property securing petitioner's notes was insufficient to pay secured creditors senior to petitioner.

Without evidence of the financial situation of the debtors and the value of collateral petitioner obtained, we are unable to determine that in 1992 through 1994 the subject loans became totally lacking in value and lacked any potential for future collectibility. See Pierson v. Commissioner, 27 T.C. 330, 338-339 (1956), affd. 253 F.2d 928 (3d Cir. 1958); Dean v. Commissioner, T.C. Memo. 1970-75. The evidence is insufficient to show that the real estate loans became worthless in the years at issue.

Unsecured Swift Loan

Petitioner became a judgment lien creditor of the Swifts in 1993 as a result of their failure to pay notes made in 1991. The next relevant event for which we have any evidence is that in 1996 the Swifts filed a petition in bankruptcy. There are no other identifiable events that can be considered to fix the worthlessness of the Swift notes in 1992, 1993, or 1994.

Personal Loans

The Wooton and Rawoof loans were made to friends of petitioner. In June of 1991 the Wootons gave petitioner a check that was subsequently dishonored on an unspecified date. The Rawoof loan was discharged in bankruptcy in 1994. There is no evidence that the Wooton loan became worthless during the years at issue. There is evidence that the Rawoof loan became worthless in 1994.

Petitioner, however, has not shown that the dominant, as opposed to merely a significant, motivation for either loan was business related. See United States v. Generes, 405 U.S. 93, 106 (1972). Self-serving statements alone will not suffice to prove a taxpayer's business purpose in advancing money. Id.

The record in this case is not sufficient for the Court to find that petitioner is entitled to a deduction with respect to his loans other than as allowed by respondent on Schedules D for the years under consideration. Because petitioner has failed to

prove the year and fact of worthlessness of the loans deducted in 1993, we need not reach the issue of whether he has shown his bases in the various loans.

Petitioner's Real Estate Rental Activity

Respondent determined that petitioner is not entitled to real estate rental losses claimed in 1992 and 1993 because his rental activity is a "passive activity" for which losses are disallowed. Additionally, respondent determined that petitioner is not entitled to the real estate rental loss claimed for 1994 because his rental activity is a passive activity and he was not a real estate professional engaged in a "real property business" for the year.

Under section 469(a), if a taxpayer is an individual, the "passive activity loss" for the taxable year shall not be allowed. The term "passive activity loss" means the amount by which "the aggregate losses from all passive activities" exceed "the aggregate income from all passive activities" for the taxable year. Sec. 469(d)(1). Except for taxpayers entitled to treatment under section 469(c)(7), Special rules for taxpayers in real property business, the term "passive activity" includes any rental activity. Sec. 469(c)(2).

Subsection (c)(7), governing taxpayers in a real property business, was added to section 469 as part of the Revenue Reconciliation Act of 1993, Pub. L. 103-66, secs. 13001,

13143(a), 107 Stat. 416, 440. The provisions of subsection (c)(7) of section 469 are effective for taxable years beginning after December 31, 1993. Id. sec. 13143(c), 107 Stat. 441. Two of the taxable years before us, 1992 and 1993, precede the effective date of the "Special rules for taxpayers in real property business" contained in subsection (c)(7). Thus, for those years petitioner may not rely on the special rules to relieve him of the generally applicable strictures of section 469 denying deductions for passive activity losses.

Section 469(i), with respect to rental real estate activities in which an individual actively participates, provides that the section 469(a) disallowance will not apply to a maximum of $25,000 of passive activity losses.[3] There is allowed only one $25,000 offset for all of petitioner's rental activities per year. Sec. 469(i)(2).

For the year 1992, petitioner reported items on Schedule E. After taking into consideration rental (passive) income, petitioner reported individually owned real estate rental losses of $50,779, partnership real estate rental losses of $12,125, and

---

[3]This nonapplication or "exemption" begins to be phased out where the taxpayer's adjusted gross income exceeds a certain level, in some circumstances $100,000. Sec. 469(i)(3).

total rental real estate (passive activity) losses of $62,903.[4]
Petitioner reported no other income from passive activities.
Petitioner's passive activity loss for the year 1992 is therefore
$62,903.  For the years 1993 and 1994, petitioner's returns
reveal on Schedules E respective passive activity losses from
individually and partnership owned residential rental property
totaling $35,456 and $82,230.

Because respondent determined that petitioner actively
participated in the listed rental activities, the section 469(a)
disallowance of a passive loss deduction will not apply to
$25,000 of petitioner's passive losses for each of the years
1992, 1993, and 1994.  The remainder of petitioners' passive
activity losses from each respective year that is disallowed as a
deduction may be carried over to the next taxable year for
application against income from passive activities, if any, and
the $25,000 offset.  Sec. 469(b); sec. 1.469-1(f)(4), Income Tax
Regs.

For petitioner's 1994 tax year, the provisions of subsection
(c)(7) of section 469 are effective.  The "Special rules for
taxpayers in real property business" contained in subsection

---

[4]For purposes of sec. 469, petitioner must aggregate his
individual and partnership real estate rental income and losses
as passive activity income and losses.  Sec. 1.702-
1(a)(8)(ii),(iii) and (b), Income Tax Regs.; see also sec. 1.469-
2T(d)(6)(v)(B), Temporary Income Tax Regs., 53 Fed. Reg. 5717
(Feb. 25, 1988).

(c)(7) provide that if its provisions apply to a taxpayer, real estate rental activity will not be a passive activity, and each of the taxpayer's interests in real estate rental will be treated separately under the section.  Sec. 469(c)(7)(A).

To qualify for treatment under section 469(c)(7), petitioner must show that more than half the personal services he performed in trades or businesses during 1994 were performed in real property trades or businesses in which he materially participated.  Sec. 469(c)(7)(B)(i).  In addition, petitioner must show that he performed more than 750 hours of services during the year in real property trades or businesses in which he materially participated.  Sec. 469(c)(7)(B)(ii).

The evidence shows that in 1994 petitioner spent substantial time in the trades or businesses of teaching chemistry and lending money.  Aside from petitioner's vague testimony, the only evidence of the amount of petitioner's personal services performed in 1994 with respect to his real estate rental property consists of two calendars that do not describe the amount of time he spent related to the rental properties, either individually or in the aggregate.  See sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

Because the evidence does not support the application of section 469(c)(7) to petitioner and his real estate rental activity in 1994, the Court concludes that he is not entitled to

deduct losses from passive activity in excess of those allowed by respondent for the year.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.